Filed 5/12/2025 5:35 PM
Leslee Mannon
District Clerk
Wichita County, Texas

Kaylee Franklin

DC78-CV2025-0957

## CAUSE NO. _____

| | | |
|---|---|---|
| STAR TEXAN PROPERTIES LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| THE RESULTS COMPANIES LLC | § | |
| D/B/A RESULTSCX, | § | |
| | § | |
| *Defendant.* | § | WICHITA COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF THIS COURT:**

NOW COMES Plaintiff Star Texan Properties, LLC ("STP"), which files this *Original Petition* complaining of Defendant The Results Companies LLC d/b/a ResultsCX ("ResultsCX"), and would respectfully show unto the Court as follows:

### I.

### DISCOVERY LEVEL

1. STP intends to conduct this proceeding under a Level 2 Discovery Control Plan pursuant to Texas Rule of Civil Procedure 190.3 but reserves the right to request a Level 3 Discovery Control Plan.

### II.

### PARTIES

2. Plaintiff Star Texan Properties LLC is a Texas limited liability company authorized to conduct business in Texas.

3. Defendant The Results Companies LLC d/b/a ResultsCX is a Delaware limited liability company that may be served with process by serving its registered agent, Cogency Global Inc., at 1601 Elm Street, Suite 4360, Dallas, Texas 75201 or wherever else it may be found.

---

**PLAINTIFF'S ORIGINAL PETITION**

### III.

### <u>JURISDICTION AND VENUE</u>

4.      This Court has jurisdiction over the parties and to award the relief requested. Pursuant to Texas Rule of Civil Procedure 47(c), STP seeks recovery of monetary damages in an amount exceeding $1,000,000.

5.      Venue for this proceeding is proper in Wichita County, Texas pursuant to Section 15.0115(a) of the Texas Civil Practice and Remedies Code because this is a suit between a landlord and a tenant arising under a lease and the leased property is located in Wichita County, Texas.

### IV.

### <u>FACTUAL BACKGROUND</u>

6.      STP is the owner of real property located at 2236 Airport Drive, Wichita Falls, Texas 76306 (the "<u>Property</u>").  ResultsCX is a former leasehold tenant at the Property.  This suit concerns ResultsCX's voluntary, unjustified failure to maintain the Property and ensuing attempt to leave a bill for millions of dollars' worth of necessary repairs to STP in violation of the lease.

7.      A copy of the subject *Lease Agreement* and *First Amendment to Lease Agreement* (collectively the "<u>Lease</u>") is attached hereto as **Ex. A**.  The Lease was originally executed between Sandalwood Pacific, L.P. ("<u>Sandalwood</u>") as landlord and USA 800, Inc. ("<u>USA 800</u>") as tenant. Under the Lease, STP is the successor in interest to Sandalwood, and ResultsCX is the successor in interest to USA 800.

8.      Paragraph 12.(a) of the Lease provides that all repairs to the Property, other than limited repairs not applicable in this case, would be the tenant's sole responsibility at its expense. Further, Paragraph 17 of the Lease required the tenant, upon expiration of the Lease's term or any earlier termination of the tenant's right of possession, to surrender the Property to Landlord "in the

same condition as received [and] broom clean." Applying these provisions as written, ResultsCX was required to return the Property to STP in the same condition as the Property was first provided to USA 800 by Sandalwood. The problem is, ResultsCX failed to do so. In fact, it did not even get close.

9. The Lease expired by its own terms on April 30, 2024. Several months prior to the expiration of the Lease, ResultsCX ceased its active operations at the Property. However, ResultsCX remained in possession of the Property throughout the full term of the Lease and surrendered the Property to STP on April 30, 2024.

10. On or about April 24, 2024, someone broke into the Property and stripped copper wire out of walls, breakers, air conditioning units, and other equipment causing extensive damage. Based on STP's investigation and estimates received from contractors, repairing the damage and restoring the Property to its pre-incident condition would cost approximately $2,477,000.00. Because the incident happened prior to termination of the Lease, it is ResultsCX's obligation to fix this damage at its sole expense. Further, STP has obtained evidence showing that ResultsCX had previously maintained alarm and security coverage of the Property but chose to let such coverage lapse before April 24, 2024, thus exposing the Property to elevated risk of damage.

11. On April 30, 2024, ResultsCX returned the severely damaged Property to STP without repairing the damage or paying to have it repaired.

12. STP has attempted at length to obtain ResultsCX's cooperation and compliance with the Lease to make or pay for the repairs to no avail. On June 14, 2024, STP sent a demand letter to ResultsCX seeking full payment of the $2,477,000.00 repair cost. A true and correct copy of this letter is attached hereto as **Ex. B**. In July 2024, ResultsCX's property insurance carrier inspected the Property but has since gone silent and now refuses to turn over any documents or

information in connection with the inspection.  STP and its counsel have had numerous subsequent communications with ResultsCX and its insurers and representatives regarding this matter but ResultsCX has failed and refused and continues to fail and refuse to repair or tender any payment toward repairs to the Property, despite the plain terms of the Lease and the fact that the incident happened prior to its termination.

13.    The damage to the Property and ResultsCX's failure and refusal to repair the damage have caused substantial damages to STP.  STP has been forced to hire contractors to commence repairs to the Property.  Further, the damage that ResultsCX has refused to repair have precluded and continue to preclude STP from re-leasing the Property, resulting in lost profits and loss of use damages to STP.

14.    Finally, under Paragraph 7.(a) of the Lease, ResultsCX was obligated to pay all real estate taxes imposed, levied, or assessed on the Property during the term of the Lease.  As the Lease's term expired on April 30, 2024, ResultsCX is responsible for one-third of the property taxes assessed on the Property for the tax year 2024.  However, despite notice and demand being given by STP, ResultsCX has failed to pay its prorated share of the 2024 property taxes on the Property, causing additional damages to STP.

## V.

## BREACH OF CONTRACT

15.    STP incorporates by reference the above paragraphs as if set forth verbatim herein.

16.    STP, as successor in interest to Sandalwood, entered into the Lease with ResultsCX, as successor in interest to USA 800.  STP fully performed its obligations under the Lease, including but not limited to providing ResultsCX with occupancy of the Property.  However, ResultsCX has

breached the Lease by failing to return the Property "in the same condition as received [and] broom clean" and by failing to pay for the necessary repairs to restore the Property to that condition.

17. As a result of ResultsCX's breaches of the Lease, STP has suffered actual damages within the jurisdictional limits of this Court, including but not necessarily limited to the cost for repairing the damage to the Property, loss of use, lost profits, and amounts owed for property taxes.

## VI.

## NEGLIGENCE

18. STP incorporates by reference the above paragraphs as if set forth verbatim herein.

19. Pleading in the alternative, if same be necessary, ResultsCX owed a legal duty to STP to exercise reasonable care to protect the Property, which was in ResultsCX's possession and control, from harm or damage. Further, having undertaken to obtain security monitoring for intrusion and fire and to maintain the security system at the Property, ResultsCX owed a legal duty to STP to exercise care in performing that undertaking and to continue to do so while ResultsCX remained in possession and control of the Property.

20. ResultsCX breached its duties to Plaintiff as shown by its actions described herein, including but not necessarily limited to negligently failing to maintain security monitoring for intrusion and fire at the Property for the entire time the Property was in ResultsCX's possession and control; negligently failing to properly maintain the security system, including all power and batteries for the security system at the Property for the entire time the Property was in ResultsCX's possession and control; and negligently failing to take other reasonable precautions to protect the Property against intrusion, theft, vandalism, and other harm for the entire time the Property was in ResultsCX's possession and control.

21.      As a result of ResultsCX's breaches of its duties, STP has suffered actual damages within the jurisdictional limits of this Court, including but not necessarily limited to the cost for repairing the damage to the Property, loss of use, and lost profits.

## VII.

## CONDITIONS PRECEDENT

22.      All conditions precedent to STP's recovery on its cause of action have occurred, have been performed, are excused or waived, or have otherwise been satisfied.

## VIII.

## ATTORNEYS' FEES

23.      Pursuant to Section 38.001, et seq., TEXAS CIVIL PRACTICE AND REMEDIES CODE, STP is entitled to recover its reasonable attorneys' fees from ResultsCX.  In this regard, STP would show that, because of ResultsCX's breaches of the Lease, it became necessary for STP to employ the services of the undersigned attorneys.  Although STP has presented its claims to ResultsCX, more than thirty days have passed, and ResultsCX has failed and refused and continue to fail and refuse to remedy its breaches.  Accordingly, STP is entitled to reasonable attorneys' fees through the trial of this cause; for additional reasonable attorneys' fees in the event this case is appealed to a Texas court of appeals; attorneys' fees in the event petition for review is filed with the Texas Supreme Court; attorneys' fees in the event petition for review is granted by the Texas Supreme Court; and attorneys' fees through the completion of proceedings before the Texas Supreme Court.

24.      Additionally, and in the alternative if same be necessary, STP is entitled to recover its reasonable and necessary attorneys' fees from ResultsCX under Paragraph 20.(f) of the Lease.

## IX.

## <u>INTEREST</u>

25.     ResultsCX has failed to pay the amounts due to STP under the Lease.  Therefore, STP is entitled to recover prejudgment and post-judgment interest at the highest rates permitted by applicable law.

## X.

## <u>RIGHT TO AMEND AND SUPPLEMENT</u>

26.     In accordance with the Texas Rules of Civil Procedure, STP reserves the right to amend and supplement its pleadings.

## XI.

## <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED,** STP respectfully requests that, upon final trial of this cause, the Court grant it the following relief against ResultsCX:

      a.  Actual damages;
      b.  Reasonable and necessary attorneys' fees;
      c.  Prejudgment and post-judgment interest at the highest rates permitted by law;
      d.  Court costs; and
      e.  All further relief, at law or in equity, to which STP is justly entitled.

Respectfully submitted,

*/s/ Graigory B. Fancher*
Graigory B. Fancher
State Bar No. 24052016
gfancher@bwwlaw.com
Eric J. Millner
State Bar No. 24041493
emillner@bwwlaw.com
Austin L. Caldera
State Bar No. 24105284
acaldera@bwwlaw.com
Bourland, Wall & Wenzel, P.C.
301 Commerce Street, Suite 2500
Fort Worth, Texas 76102-4125
Telephone: (817) 877-1088
Facsimile: (817) 877-1636
**ATTORNEYS FOR PLAINTIFF**
**STAR TEXAN PROPERTIES LLC**

# Ex. A

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (this "*First Amendment*") is made and entered into as of the 27th day of July, 2020 (the "*Effective Date*") by and between Wichita Calls, LLC, a Texas limited partnership ("*Landlord*") and TRC TopCo, LLC, a Delaware limited liability company ("*Tenant*").

### BACKGROUND:

A. Landlord and Tenant (as successor-in-interest to USA 800, Inc., a Missouri corporation), entered into that certain Lease Agreement dated November 1, 2016 (the "*Lease*"). The Lease currently covers approximately 36,879 square feet of rentable area (the "*Premises*") in the building located at 2233 Airport Drive, Wichita Falls, Texas 76306 (the "*Building*").

B. Landlord and Tenant desire to amend the Lease as set forth herein.

C. Landlord has agreed to replace the HVAC Controls System with an Integrated Controls System and Motor Controller on the Middle 50-ton HVAC unit in the Building (the "*HVAC Repairs*"), and the parties now desire to extend the Lease, and to modify the Lease's Monthly Base Rent Schedule accordingly.

### AMENDMENTS:

NOW, THEREFORE, in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Lease Term**. The Lease Term is hereby amended to be 90 months, plus the partial month, if any, following the Commencement Date.

2. **Annual and Monthly Base Rent Schedule:** The Annual and Monthly Base Rent Schedule of the Lease is hereby amended by replacing the Annual and Monthly Base Rent Schedule table with the following table:

| Beginning | Ending | Monthly Rent | Total |
|-----------|--------|--------------|-------|
| 11/1/2016 | 4/30/2017 | $7,500.00 | $45,000.00 |
| 5/1/2017 | 10/31/2017 | $12,500.00 | $75,000.00 |
| 11/1/2017 | 10/31/2018 | $26,041.67 | $312,500.04 |
| 11/1/2018 | 10/31/2019 | $39,952.25 | $479,427.00 |
| 11/1/2019 | 3/31/2020 | $41,488.88 | $207,444.40 |
| 4/1/2020 | 5/31/2020 | $20,744.44 | $41,488.88 |
| 6/1/2020 | 10/31/2020 | $42,158.81 | $210,794.05 |
| 11/1/2020 | 10/31/2021 | $43,694.82 | $524,337.84 |

FIRST AMENDMENT TO LEASE – TRC TopCo, LLC

Page 1

| 11/1/2021 | 10/31/2022 | $45,231.45 | $542,777.41 |
| 11/1/2022 | 10/31/2023 | $46,768.07 | $561,216.84 |
| 11/1/2023 | 4/30/2024 | $48,304.70 | $289,828.20 |

3. **HVAC Repairs**. The parties agree that Landlord will perform the HVAC Repairs in accordance with the James Lane AC and Plumbing Estimate dated 6/3/2020 attached as Exhibit A to this First Amendment.

4. **Miscellaneous**.

   a. Amendment to Lease. The parties acknowledge and agree that the Lease has not been amended or modified in any respect, other than by this First Amendment and as referenced in this First Amendment, and there are no other agreements of any kind currently in force and effect between the parties with respect to the Leased Premises or the Building. The term "*Lease*" shall mean the Lease as so amended, unless the context requires otherwise.

   b. Entire Agreement. This First Amendment sets forth all covenants, agreements and understandings among the parties with respect to the subject matter hereof and there are no other covenants, conditions or understandings, either written or oral between the parties hereto except as set forth in this First Amendment.

   c. Full Force and Effect. Except as expressly amended hereby, all other items and provisions of the Lease, as amended, remain unchanged and continue to be in full force and effect.

   d. Conflicts. The terms of this First Amendment shall control over any conflicts between the terms of the Lease and the terms of this First Amendment.

   e. Authority of Tenant. Tenant warrants and represents unto Landlord that (i) Tenant has full right and authority to execute, deliver and perform this First Amendment; and (ii) the person executing this First Amendment was authorized to do so.

   f. Capitalized Terms. Capitalized terms not defined herein shall have the same meanings attached to such terms under the Lease.

   g. Successors and Assigns. This First Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

   h. Governing Law. This First Amendment shall be governed by, and construed in accordance with, the laws of the State of Texas.

[Signature Page Follows]

IN WITNESS WHEREOF, executed by each party hereto to be effective as of the Effective Date.

*Landlord*:

WICHITA CALLS, LLC,
A Texas limited liability company
By: SkyWalker Property Partners, Inc
its managers

By: _____
Gary Walker, President

*Tenant*:

TRC TopCo, LLC,
a Delaware limited liability company

By: _____
Name: Donald Norsworthy
Title: CFO

## Exhibit A

**USA 800**
2236 Airport Dr.
Wichita Falls, TX

**James Lane AC and Plumbing**
5024 Jacksboro Hwy
Wichita Falls, TX 76302

Phone: (940) 500-4704
Email: robbh@jameslane.com
Web: www.jameslane.com

| | Estimate # | 001076 |
|---|---|---|
| | Date | 06/03/2020 |

| Description | Rate |
|---|---|
| | |
| Controls Option 2 (Integrated Controls) | $60,919.00 |
| - Install new internet accessible front end control system<br>- Install new Carrier integrated controller for each rooftop unit<br>- Install new Carrier integrated controller for each VAV unit | |
| | |
| Middle 50-ton HVAC Roof Top Unit Repair | $11,930.00 |
| - Swap out motor controller with new and test operation. | |



| Subtotal | $0.00 |
|---|---|
| **Total** | **$0.00** |

FIRST AMENDMENT TO LEASE – TRC TopCo, LLC

Page 4

LEASE AGREEMENT

for

2236 AIRPORT DRIVE
WICHITA FALLS, TX

between

LANDLORD:

SANDALWOOD PACIFIC, L.P.

LESSEE:

USA 800, INC.

DATE:  November 1, 2016

TABLE OF CONTENTS

BASIC LEASE TERMS AND INFORMATION ...................................................................1
1.   Granting Clause ........................................................................................................2
2.   Construction; Acceptance of Premises ....................................................................2
     (a)    Construction .................................................................................................2
     (b)    Rentable Area ...............................................................................................3
     (c)    Construction of Tenant's Work; Early Occupancy ......................................3
     (d)    AS IS, WHERE IS CONDITION ................................................................3
3.   Use ...........................................................................................................................4
     (a)    Permitted Use ...............................................................................................4
     (b)    Compliance with Laws. .................................................................................4
     (c)    Environmental Requirements ........................................................................5
4.   Rent ..........................................................................................................................6
     (a)    Base Rent and Additional Rent ....................................................................6
     (b)    Late Rent ......................................................................................................7
     (c)    Interest on Past Due Obligations ..................................................................7
5.   Security Deposit .......................................................................................................7
     (a)    Security Deposit ...........................................................................................7
     (b)    Security Interest ............................................................................................8
6.   Utilities .....................................................................................................................8
7.   Taxes ........................................................................................................................8
     (a)    Real Estate Taxes .........................................................................................9
     (b)    Rent Taxes ....................................................................................................9
     (c)    Personal Property Taxes. ..............................................................................9
     (d)    Payments to Mortgagee ................................................................................9
     (e)    Public Incentives and Abatements ...............................................................9
     (f) Contest.......................................................................................................10
8.   Insurance. ...............................................................................................................10
     (a)    Landlord's Insurance ..................................................................................10
     (b)    Tenant's Insurance .....................................................................................10
     (c)    Waiver of Subrogation ...............................................................................11
9.   Restoration; Damage to Tenant's Property ...........................................................11
10.  Condemnation ........................................................................................................13
11.  Indemnification ......................................................................................................13
12.  Tenant Repairs .......................................................................................................14
13.  Tenant-Made Alterations and Trade Fixtures ........................................................15
14.  Signs ......................................................................................................................17
15.  Assignment and Subletting ....................................................................................17
16.  Inspection and Access ............................................................................................19
17.  Surrender ................................................................................................................19
18.  Holding Over ..........................................................................................................19
19.  Events of Default ...................................................................................................20
20.  Landlord's Remedies ..............................................................................................21

21. **Limitation of Liability of Landlord**.............................................................................24
22. **Waiver of Jury Trial**...................................................................................................25
23. **Subordination**...........................................................................................................25
24. **Mechanic's Liens** .....................................................................................................25
25. **Certificates to Be Provided by Tenant**......................................................................26
    (a)    Certificate of Acceptance .....................................................................26
    (b)    Estoppel Certificates ...........................................................................26
    (c)    Financial Statements ...........................................................................26
26. **Miscellaneous** ..........................................................................................................26
    (a)    Force Majeure .....................................................................................27
    (b)    Entire Agreement ................................................................................27
    (c)    Severability..........................................................................................27
    (d)    Brokers ................................................................................................27
    (e)    Joint and Several Liability...................................................................28
    (f)    Notices.................................................................................................28
    (g)    Landlord's Reserved Rights ................................................................28
    (h)    Memorandum of Lease.........................................................................28
    (i)    Rules of Construction..........................................................................28
    (j)    Submission of Lease.............................................................................29
    (k)    Gender; Captions.................................................................................29
    (l)    Governing Law.....................................................................................29
    (m)    Time of Essence ..................................................................................29
    (n)    Tenant Authority .................................................................................29
    (o)    Exhibits and Addenda .........................................................................29

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "Lease") is made between the Landlord and Tenant named below, effective as of the date that this Lease is last executed by Landlord and Tenant (the "Effective Date").

### BASIC LEASE TERMS AND INFORMATION

| | |
|---|---|
| **Landlord:** | Sandalwood Pacific, L.P., a Texas limited Partnership |
| **Address for mail and deliveries:** | Sandalwood Pacific, LP.<br>80 North King Street<br>Honolulu, Hawaii 96817 |
| **Telephone:**<br>**Facsimile:**<br>**Electronic Address:** | (808) 531-5200<br>(808) 521-7710<br>jmcl@lykl.com |
| **Tenant:** | USA 800, Inc., a Missouri corporation. |
| **Address for mail and deliveries:** | 9808 E. 66th Terrace<br>Kansas City, MO 64133 |
| **Telephone:**<br>**Facsimile:**<br>**Electronic Address:** | (800) 821-7539 ext. 30302<br>816-358-8845<br>dan.quigley@usa800.com |
| **Premises:** | The land more particularly described in **Exhibit A** attached hereto and all improvements located thereon, including but not limited to the existing building located thereon ("Building"), together with any improvements to be constructed pursuant to this Lease. |
| **Lease Term:** | EIGHTY FOUR (84) months, plus the partial month, if any, following the Commencement Date. |
| **Target Commencement Date:** | November 1, 2016 |

Lease Agreement – Page 1

**Annual and Monthly Base Rent Schedule:**

| Months | Monthly Installment | Total |
|---|---|---|
| 1-6 | $15,000.00 | $90,000.00 |
| 7-12 | $25,000.00 | $150,000.00 |
| 13-24 | $26,041.67 | $312,500.04 |
| 25-36 | $39,952.25 | $479,427.00 |
| 37-48 | $41,488.88 | $497,866.56 |
| 48-60 | $43,025.50 | $516,301.00 |
| 61-72 | $44,562.13 | $534,735.56 |
| 73-84 | $46,098.75 | $553,185.00 |

Total Base Rent -                                                    $3,134,015.16

**Security Deposit:**          $46,098.75

**Permitted Use:**          General Office and Call Center purposes and related and ancillary uses only.

**Exhibits:**

| | | |
|---|---|---|
| Exhibit A | - | Legal Description of Land |
| Exhibit B | - | Work Letter Agreement |
| Exhibit C | - | Option to Extend |
| Exhibit D | - | Tenant Estoppel Certificate |
| Exhibit E | - | Early Termination Option |

1.      **Granting Clause**.  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.  The Lease Term shall commence on the Target Commencement Date and shall end on the date that follows the remainder of the month in which the Commencement Date occurs plus the number of full months in the Lease Term.

2.      **Construction; Acceptance of Premises**.

(a)      Construction. As of the date of this Lease Agreement, Tenant represents and warrants that it has not begun construction within the Premises and that Landlord has not provided any approvals for any improvements.  If construction is required with respect to the Premises, it shall be done pursuant to the provisions of the Work Letter Agreement attached hereto as **Exhibit B** (the "Work Letter Agreement").  All installations and improvements now or hereafter placed on the Premises shall be at Tenant's cost, except as otherwise provided herein, including, without limitation, costs of Tenant's Work that are subject to be reimbursement from the Allowance (as defined in the Work Letter Agreement), as provided for in the Work Letter Agreement (and Tenant shall pay ad valorem taxes and increased insurance thereon or attributable thereto, which cost shall be payable by Tenant to Landlord upon demand as additional rent).  Tenant shall construct the improvements described as Tenant's Work in the

Lease Agreement – Page 2

Work Letter Agreement (the "Tenant's Work"). Except as set forth in the Work Letter Agreement, Landlord shall not be required to make any alterations, additions or improvements to the Premises or to provide any allowance for the payment of the costs thereof.

(b)     Rentable Area. Landlord and Tenant stipulate and agree that the Building contains 36,879 rentable square feet.

(c)     Construction of Tenant's Work; Early Occupancy. Tenant acknowledges that Tenant has had access to the Premises prior to the date the date of this Lease as provided in that certain letter agreement between Landlord and Tenant dated September 26, 2016, for the purposes set forth in such letter agreement.  Prior to the Commencement Date, Tenant may not commence out-bound or in-bound calling operations except as provided for in that certain Letter of Agreement by and between Landlord and Tenant dated September 26, 2016, as amended by that certain Amendment to the Letter Agreement dated September 26, 2016 by and between Landlord and Tenant.

(d)     AS IS, WHERE IS CONDITION. LANDLORD MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE PREMISES, ANY FURNITURE FIXTURES OR EQUIPMENT CURRENTLY IN THE PREMISES OR ANY INFORMATION DELIVERED BY LANDLORD TO TENANT IN CONNECTION WITH THE PREMISES. TENANT IS LEASING THE PREMISES "AS IS", WITH ALL FAULTS AND DEFECTS, KNOWN OR UNKNOWN, LATENT OR PATENT, WITHOUT ANY REPRESENTATION OR WARRANTY, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY, MERCHANTABILITY, SUITABILITY OR QUALITY, AND IN SOLE RELIANCE ON TENANT'S OWN INDEPENDENT INSPECTION, INQUIRY AND/OR INVESTIGATION. SPECIFICALLY, LANDLORD IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED WITH RESPECT TO THE PREMISES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE, ZONING, PLATTING, SUBDIVISION, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, VALUATION, GOVERNMENTAL APPROVALS, COMPLIANCE WITH GOVERNMENTAL REGULATIONS, INCLUDING, BUT NOT LIMITED TO THE AMERICANS WITH DISABILITIES ACT, OR ANY OTHER MATTERS OR THINGS RELATING TO OR AFFECTING THE PREMISES INCLUDING, WITHOUT LIMITATION: (I) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PREMISES, (II) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PREMISES OR (III) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PREMISES. TENANT REPRESENTS THAT IT IS A KNOWLEDGEABLE TENANT OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF TENANT'S CONSULTANTS, AND THAT TENANT HAS CONDUCTED INSPECTIONS AND INVESTIGATIONS OF THE PREMISES, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY

Lease Agreement – Page 3

UPON SAME, AND ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY TENANT'S INSPECTION AND INVESTIGATIONS.    THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PREMISES BY LANDLORD, ANY AGENT OF LANDLORD OR ANY THIRD PARTY.

    **3.**    **Use.**

    (a)    <u>Permitted Use.</u> The Premises shall be used only for the Permitted Use and for no other purpose without Landlord's prior written consent.  Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises.  Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any other party. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would (i) void any insurance on the Premises; (ii) increase the insurance risk; (iii) cause the disallowance of any sprinkler credits; (iv) be prohibited by any applicable laws, rules regulations, ordinances, or restrictions of any government entity; or (v) violate any applicable agreements to which Tenant is bound or of which Tenant has notice.  If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord.

    (b)    <u>Compliance with Laws</u>. Tenant, at its sole expense, shall comply with, and shall use and occupy the Premises in compliance with, (i) all laws applicable to the Premises, including, without limitation, the Americans With Disabilities Act, and all orders, judgments, ordinances, regulations, codes, directives, permits and licenses, now or hereafter applicable to the Premises arising out of Tenant's use of the Premises (collectively, "Legal Requirements"); and (ii) all easements, covenants and restrictions now or hereafter applicable to the Premises. The Premises shall not be used as a place of public accommodation under the Americans with Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time. Tenant shall, at its expense, make any alterations or modifications, within or outside the Premises that are required by Legal Requirements.

    (c)    <u>Environmental Requirements</u>

    (i)    Except for Hazardous Materials contained in products used by Tenant in quantities for ordinary cleaning and office purposes in compliance with Environmental Requirements, Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises.  Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements, and shall remediate (in a manner satisfactory to Landlord and the applicable governmental entity having jurisdiction over such remediation) any Hazardous

Lease Agreement – Page 4

Materials released on, under, to or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource and Conservation Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Material(s)" means and includes [a] any substance, material, waste, pollutant or contaminant listed or defined as hazardous or toxic under any Environmental Requirements; [b] asbestos; [c] petroleum, including crude oil or any fraction thereof; and [d] natural gas or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

(ii)     Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation removal or management of any asbestos brought into the Premises or disturbed in breach of the requirements of this paragraph (c), regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials in, on or about the Premises after the Commencement Date or any breach of the requirements under this Paragraph by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph shall survive the expiration or any earlier termination of this Lease. Landlord hereby represents that, as of the Commencement Date, Landlord has not received any written notice from any governmental authority that Hazardous Materials are present in, on or about the Premises in excess of permissible levels allowed by Environmental Requirements, and that to Landlord's current actual knowledge, without investigation or inquiry, there are no Hazardous Materials in the Premises in excess of levels permitted by Environmental Requirements.

(iii)     Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior written notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted by a

Lease Agreement – Page 5

qualified, licensed professional and be at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

### 4.    Rent.

(a)    <u>Base Rent and Additional Rent</u>. Throughout the Lease Term, Tenant shall pay Base Rent in the amount set forth above.  The installment of Base Rent for the first month of the Lease Term shall be due and payable on the date hereof, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent and Additional Rent (Base Rent and Additional Rent is collectively referred to in this Lease as "Rent" or "rent") on or before the first day of each calendar month commencing on the Commencement Date.  If the Lease Term commences or expires on a date other than the first day or the last day of a calendar month, respectively, then the Rent payable for such partial calendar month shall be an amount equal to the monthly installment of Rent otherwise then in effect, divided by thirty (30) and multiplied by the number of days in the partial calendar month after and including the Commencement Date or before and including the date of expiration, respectively, and provided further that the Rent for any partial calendar month at the commencement of the Initial Lease Term shall be payable on the first day of the first full calendar month during the Lease Term. All sums, liabilities, obligations and other amounts which Tenant is required to pay or discharge pursuant to this Lease in addition to Base Rent (including, but not limited to reimbursement of management fees for Landlord's property manager [which shall not exceed the greater of $1,000.00 per month or three percent (3%) of monthly Rent] and Capital Repair Costs [as defined in paragraph 12(c) of this Lease] paid by Landlord), together with any interest, penalty, or other sum which may be added for late payment thereof, shall constitute additional rent hereunder (herein called "Additional Rent").  In the event of any failure on the part of Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided for herein (or by law or equity or otherwise) in the case of nonpayment of Base Rent.  All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith. Any payments or charges due from Tenant to Landlord hereunder shall be considered Rent for all purposes of this Lease. The obligation of Tenant to pay Rent and the obligations of Landlord under this Lease are independent obligations.  Unless otherwise provided for herein, Tenant shall have no right at any time to abate, reduce, or set-off any Rent due hereunder.

(b)    <u>Late Rent</u>. Tenant acknowledges that late payment by Tenant to Landlord of rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be difficult to ascertain, including, but not limited to, processing and accounting charges and late charges which may be imposed on Landlord by the provisions of any mortgage or deed of trust covering the Premises.  Consequently, in the event that, for any reason whatsoever, any installment of Base Rental or other sum due hereunder is not received within five (5) days after its due date, for any reason whatsoever, a service charge of 5% of such amount due shall be paid by Tenant.  Any such service charge or Interest shall be payable as rent

Lease Agreement – Page 6

hereunder and shall be payable on demand.  The parties hereby agree that the service charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant.  Acceptance of the service charge by Landlord shall not constitute a waiver of Tenant's default with respect to such overdue amount and shall not be construed as liquidated damages, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.  The failure of Tenant to pay the service charge as herein stated shall be an event of default hereunder.

(c)  Interest on Past Due Obligations.  Any amount not paid by Tenant after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or twelve percent (12%) per annum.  It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease.  If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

**5.  Security Deposit**

(a)  Security Deposit. Tenant shall deposit the Security Deposit with Landlord upon execution of this Lease.  The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease.  The Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant.  Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of any default by Tenant.  Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount.  If Tenant is not in default at the termination of the Lease, and has complied with all of the provisions of this Lease to be performed by Tenant, including surrender of the Premises in accordance with the provisions hereof, the balance of the Security Deposit remaining after such termination shall be returned by Landlord to Tenant within sixty (60) days after the later of the termination of this Lease or the date that Tenant has fully performed all of its obligations in this Lease.  Tenant will not assign or encumber Tenant's interest in the Security Deposit, and neither Landlord nor Landlord's successors or assigns will be bound by any such attempted assignment or encumbrance of the Security Deposit.  In the event of a sale of the Premises, or a transfer by Landlord of its interests under this Lease, Landlord shall have the right to transfer the Security Deposit to the purchaser or owner of this Lease, in which event, Landlord shall thereupon be released from all liability for the return of

Lease Agreement – Page 7

the Security Deposit to Tenant and Tenant agrees to look solely to the new purchaser or owner for the return of the Security Deposit.

(b)     Security Interest As security for the performance of its obligations to the Landlord under this Lease, Tenant hereby grants a security interest to Landlord in the Security Deposit in accordance with the provisions of the Uniform Commercial Code as in effect in the State of Texas, and agrees that Landlord shall be entitled to exercise all remedies available to a secured party thereunder with respect to the Security Deposit.

6.     Utilities Tenant shall arrange and contract for in its own name and pay directly to the utility supplier for all utilities necessary for the use and operation of the Premises for the Permitted Use, including, but not limited to, water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises.  Tenant, at its expense, shall use reasonable efforts to maintain the continuation of such services; but nothing contained in this Lease shall constitute any consent or request by Landlord, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord or the Premises in respect thereof.  Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of any utility service furnished to the Premises unless such failure or defect is caused by willful misconduct of Landlord, nor shall Tenant be entitled to receive an offset or abatement of rent or damages, or be relieved from the obligation to fulfill any covenant or agreement contained herein as a result thereof. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent unless such interruption or failure is caused by willful misconduct of Landlord

7.     Taxes

(a)     Real Estate Taxes. Tenant agrees to pay and to provide evidence of payment to Landlord, not less than thirty (30) days before the date such taxes are delinquent, all taxes, fees or charges, rates, duties and assessments, imposed, levied, or assessed against the Premises or any portion thereof during the Lease Term, general and special, foreseen and unforeseen ("Taxes").  If Tenant fails to timely pay or to timely provide evidence of payment of such Taxes to Landlord, Landlord shall be entitled, without notice, to pay such sums directly to the taxing authorities entitled thereto and Tenant agrees to pay to Landlord the amount of such Taxes paid by Landlord within fifteen (15) days following receipt of an invoice therefor. With respect to any partial calendar year during the Lease Term, Tenant's responsibility for Taxes shall be prorated.

(b)     Rent Taxes. All capital levies or other taxes assessed or imposed on Landlord upon the Rent payable to Landlord under this Lease and any margin tax, franchise tax, excise, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such Rents from the Premises or any portion thereof shall be paid by Tenant or upon demand; provided, however, in no event shall Tenant be liable for any net income taxes

Lease Agreement – Page 8

imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder.  If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require. If it is not lawful for Tenant to pay such taxes or to reimburse Landlord therefor, the Base Rent payable to Landlord under this Lease will be revised to yield to Landlord the same net rental after the imposition of any such tax upon Landlord as would have been payable to Landlord prior to the imposition of any such tax.

(c)      Personal Property Taxes. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures of Tenant placed in the Premises, whether levied or assessed against Landlord or Tenant.  Tenant shall furnish to Landlord evidence of payment of any amount payable under this Paragraph before the same is due and shall furnish to Landlord, within ten (10) days after reasonable demand by Landlord, proof of the payment of any other amount which is the obligation of Tenant hereunder.

(d)      Payments to Mortgagee. In the event that Landlord becomes obligated to a mortgagee to make payments for Taxes in accordance with the terms of the mortgage, upon notice thereof by Landlord, Tenant shall pay to Landlord on the payment dates for Base Rent, the amounts required by the mortgagee.  Tenant shall not be liable to Landlord, any mortgagee or third party for any Taxes with respect to the Premises for which Tenant has deposited sufficient funds with Landlord to pay such Taxes.

(e)      Public Incentives and Abatements. Tenant shall satisfy the requirements of any public or private incentives, abatements or other benefits awarded to and accepted by Tenant or the Premises (whether one or more, the "Incentives") if the failure to satisfy such requirements results in the imposition or creation of any loss, damage, liability, encumbrance or lien in favor of the provider of such Incentives on the part of Landlord or the Premises.  Tenant shall indemnify and hold Landlord harmless from any loss, cost or damage, including but not limited to reasonable attorneys' fees resulting at any time during the Lease Term or thereafter as a result of Tenant's failure to satisfy requirements imposed in connection with any of the Incentives.

(f)      Contest. Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof.  Tenant shall reimburse Landlord for all costs incurred by Landlord in connection therewith within fifteen (15) days following receipt of an invoice therefor.  If Landlord has not commenced proceedings to contest Taxes and does not intend to commence such proceedings, Tenant, at the Tenant's expense, and, if legally required, in the name of the Landlord, may at its option, contest (after obtaining the prior written consent of Landlord), by appropriate legal proceedings conducted with due diligence, the assessed valuation of the Premises for purposes of determining Taxes, provided that (i) such right to contest shall not affect or limit Tenant's obligation to timely pay all Taxes as and when due and in accordance with the provisions of this Lease, (ii) neither the Premises nor any interest of the Landlord therein, would be in any danger of being sold, forfeited or lost by reason of the pendency of such proceedings, (iii) such contest is permitted by Landlord's lender, and Tenant complies with all requirements of Landlord's lender applicable thereto, (iv) the Landlord would not be in any danger of any criminal liability or, unless the Tenant shall have furnished a bond or other security therefor reasonably satisfactory to the Landlord, any additional civil liability

Lease Agreement – Page 9

for failure to comply therewith during the pendency of such proceedings, and (v) the Premises would not be subject to the imposition of any lien as a result of such failure during the pendency of such proceedings. The Landlord will reasonably cooperate with the Tenant in any such contest, at Tenant's expense, which amounts Tenant agrees to pay to Landlord within fifteen (15) days following receipt of an invoice therefor; however, Landlord shall not be required to incur any liabilities in connection therewith.

**8.    Insurance.**

(a)    Landlord's Insurance. Tenant shall reimburse Landlord for the property and liability insurance maintained by Landlord that is determined as appropriate by Landlord, provided however that such insurance shall include full replacement value. The Premises may be included in a blanket policy (in which case the cost of such insurance allocable to the Premises will be determined by Landlord based upon the insurer's cost calculations). At Landlord's option, Tenant's reimbursement for the insurance maintained by Landlord shall be paid in lump sums within thirty (30) days after demand from Landlord or in monthly installments of the annual amount estimated by Landlord at the same time that monthly Base Rent is payable. If the total of Tenant's monthly installments is less than the annual amount actually paid by Landlord, Tenant shall pay the difference to Landlord within thirty (30) days after demand. If the total of Tenant's monthly payments is greater than the annual amount actually paid by Landlord, then Landlord may apply such excess to the estimate for the following year, provided, however, that any such excess at the end of the Lease Term shall be paid to Tenant after all amounts due Landlord have been paid in full.

(b)    Tenant's Insurance. Tenant, at its expense, shall maintain during the Lease Term (i) all risk property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant; (ii) worker's compensation insurance with no less than the minimum limits required by law; (iii) employer's liability insurance with such limits as required by law; (iv) a minimum of twelve (12) months of business interruption insurance regarding the Premises only; and (v) commercial general liability insurance written on an ISO "occurrence" form or its equivalent applying to the use and occupancy of the Premises, and the business operated by Tenant or any other occupant, including, if applicable the use of any part of the Premises as a public bus stop. Such insurance shall include contractual liability insurance coverage insuring all of Tenant's indemnity obligations under this Lease. Such coverage shall have a minimum bodily injury and property damage combined single limit of liability of at least Two Million Dollars ($2,000,000), and a general aggregate limit of at least Four Million Dollars ($4,000,000). The general aggregate limit shall apply exclusively to the Premises. All such policies shall be written to apply to all bodily injury, property damage, personal injury and other covered loss, however occasioned, arising out of Tenant's use, occupancy, and maintenance in, upon or about the Premises during the policy term, and shall be endorsed to provide that such coverage shall be primary and that any insurance maintained by Landlord shall be excess insurance only. Tenant may satisfy such insurance limits by a combination of base coverage and umbrella or excess policy. Such coverage shall also contain endorsements or specific coverage to the extent such coverage is included in the policy's form: (i) deleting any employee exclusion on personal injury coverage; (ii) including employees as additional insureds; (iii) deleting any liquor liability exclusion; (iv)

Lease Agreement – Page 10

providing for coverage of employer's automobile non-ownership liability; (v) adding fire damage legal liability coverage of at least Three Hundred Thousand Dollars ($300,000) per any one occurrence and (vi) deleting any work/product exclusion, so that coverage will exist for damage resulting from work performed on the Premises or the Building or common areas whether by Landlord, Prospect or contractors or subcontractors working directly or indirectly for either; (vii) personal and advertising injury of at least One Million Dollars ($1,000,000) per Person/Organization, subject to a general aggregate limit of at least Two Million Dollars ($2,000,000), and (ix) blanket contractual liability insurance. The insurance required by the foregoing provisions of this subparagraph shall provide for severability of interests; shall provide that an act or omission of one of the named or additional insureds shall not reduce or avoid coverage to the other named or additional insureds; and shall afford coverage for all claims based on acts, omissions, injury and damage, which claims occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period. The insurance required by the above provisions shall be subject to a self-insured retention greater than Ten Thousand Dollars ($10,000) for property damage, personal injuries, bodily injuries, or deaths of persons occurring in or about the Premises. Landlord may from time to time require reasonable increases in any such limits and to require any other form or forms of insurance as Landlord or mortgagees of Landlord may reasonably require from time to time in form, in amounts and for insurance risks against which a prudent tenant would protect itself. The commercial liability policy shall name Landlord as an additional insured, insure on an occurrence and not a claims-made basis, be issued by insurance companies which are reasonably acceptable to Landlord, include an endorsement providing for 30 days prior written notice shall have been given to Landlord prior to cancellation, contain a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such policies or certificates thereof shall be delivered to Landlord by Tenant prior to the Commencement Date and not less than thirty (30) days prior to expiration or termination of any existing policy of insurance. All insurance policies required by this subsection (b) shall be issued by insurers licensed to do business in Texas with a current Best Rating acceptable to Landlord and in form satisfactory from time to time to Landlord.

(c)    Waiver of Subrogation. The property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and a waiver of all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents and invitees, in connection with any loss or damage thereby insured against. Neither party nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to the other for loss or damage caused by any risk coverable by all risk property insurance, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of a party to insure its property shall not void this waiver. LANDLORD AND ITS AGENTS, EMPLOYEES AND CONTRACTORS SHALL NOT BE LIABLE FOR, AND TENANT HEREBY WAIVES ALL CLAIMS AGAINST SUCH PARTIES FOR, BUSINESS INTERRUPTION AND LOSSES OCCASIONED THEREBY SUSTAINED BY TENANT OR ANY PERSON CLAIMING THROUGH TENANT RESULTING FROM ANY ACCIDENT OR OCCURRENCE IN OR UPON THE PREMISES FROM ANY CAUSE WHATSOEVER, EXCEPT TO THE EXTENT ANY SUCH, DAMAGE IS CAUSED IN WHOLE OR IN PART,

Lease Agreement – Page 11

DIRECTLY OR INDIRECTLY, BY THE GROSS NEGLIGENCE OF LANDLORD OR ITS AGENTS, EMPLOYEES OR CONTRACTORS.

  **9.**  **Restoration; Damage to Tenant's Property.**

  (a)  If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Tenant shall provide written notice thereof to Landlord within three (3) days after the occurrence of such fire or other casualty. If the Premises shall be so damaged that substantial alteration or reconstruction of the Premises shall, in Landlord's reasonable opinion, be required, or in the event any mortgagee of Landlord should require that the insurance proceeds payable as a result of a casualty be applied to the payment of the mortgage debt, or in the event of any uninsured loss to the Premises, Landlord may, at its option, terminate this Lease by notifying Tenant in writing of such termination within one hundred twenty (120) days after the date of such casualty, and Tenant shall have all rights and remedies provided for herein with respect to any termination of this Lease by Landlord.  If Landlord does not thus elect to terminate this Lease, Landlord shall commence and proceed with reasonable diligence to restore the Premises to substantially the same condition in which it was immediately prior to the happening of the casualty, except that Landlord's obligation to restore shall not exceed the scope of the work required to be done by Landlord in originally constructing the Premises, nor shall Landlord be required to spend for such work an amount in excess of the insurance proceeds actually received by Landlord as a result of the casualty together with the deductible payable by Landlord. When the damaged portion of the Premises has been restored to such condition by Landlord, Tenant shall complete the reconstruction of all improvements installed in the Premises by Tenant and the restoration of Tenant's furniture and equipment at Tenant's sole expense.  All cost and expense of Landlord for reconstructing the Premises in excess of the net insurance proceeds actually paid to Landlord in connection with any such casualty, including any deductible amount, shall be borne by Tenant and shall be paid by Tenant to Landlord within fifteen (15) days following demand therefor, provided however, Tenant's obligation to pay such costs shall not exceed the lesser of $5,000.00 or five percent (5%) of the loss.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such damage or the repair thereof.

  (b)  Landlord or its agents shall not be liable for any loss of or damage to any property by theft or otherwise, nor for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, contaminated air, gas, electricity, water or rain which may leak from or flow into any part of the Building or from the breakage, leakage, obstruction or other defects in any pipes, appliances, sprinklers, wires, HVAC, fixtures or plumbing works whether the damage or injury results from conditions arising upon the Premises or upon other portions of the Building or from other sources.  Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or in the Building or of defects therein or in the fixtures or equipment.

  (c)  In the event of repair, reconstruction and restoration by Landlord as herein provided, the rental provided to be paid under this Lease shall be abated proportionately with the degree of objective interference with the reasonable use of the Premises for the Permitted

Lease Agreement – Page 12

Use, during the period of such repair, reconstruction or restoration. Tenant shall not be entitled to any compensation or damages for loss in the use of the whole or any part of the Premises and/or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

**10.      Condemnation.** If any part of the improvements constituting a part of the Premises, all access to the Premises or parking spaces that are required for compliance with zoning should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, then Base Rent payable shall be abated proportionately. In the event of any such Taking, Landlord shall be entitled to receive the entire award, compensation or proceeds from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for moving expenses and damage to Tenant's Trade Fixtures.

**11.      Indemnification.**

(a)      Landlord and its partners and their respective members, managers, directors, officers, employees and agents (individually, a "Landlord Party" and collectively, the "Landlord Parties") will not be liable for and Tenant hereby releases the Landlord Parties of and from, and will protect, indemnify and save harmless the Landlord Parties from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against any Landlord Party by reason of the occurrence or existence of any of the following during the Lease Term or thereafter (while Tenant is in possession of the Premises) provided, however, that such occurrence or existence is not the result of the gross negligence and willful misconduct of Landlord, (i) ownership of the Premises or any interest therein or receipt of any rent or other sum therefrom, (ii) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Premises or any part thereof or occurring on or about the adjoining sidewalks, curbs, loading docks, stairs, vaults and vault space, if any, streets or ways as a result of or in connection with Tenant's use or occupancy of the Premises or, the existence of any public bus stop on the Premises, (iii) any occupancy, use, nonuse or condition of the Premises or any part thereof or any use, nonuse or condition of the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways resulting from Tenant's use or occupancy of the Premises, (iv) any failure on the part of Tenant to perform or comply with any of the terms of this Lease, or (v) performance of any labor or services or the furnishing of any materials or other property in respect of the Premises or any part thereof, EVEN IF DUE TO THE CONCURRENT NEGLIGENCE OF ANY LANDLORD PARTY, other than gross negligence and willful misconduct of Landlord or any Landlord Party. In case any action, suit or proceeding is brought against Landlord by reason of any such occurrence, Tenant, upon request, and at Tenant's

Lease Agreement – Page 13

expense, shall resist and defend such action, suit or proceeding or cause the same to be resisted and defended by counsel designated by Tenant and reasonably approved by Landlord. The obligations of Tenant under this Paragraph shall survive any termination of this Lease. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph.

## 12.    Tenant Repairs

(a)    Except as otherwise provided in subparagraph 12(b) of this Lease, Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises and all improvements and systems serving the Premises, excluding any repair or replacement that constitutes a "Capital Repair," as defined herein. Any repair or replacement shall be performed at Tenant's expense by contractors approved by Landlord. Heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises shall be maintained at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's election, by Landlord. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to make such repairs or replacements within thirty (30) days after written notice thereof from Landlord to Tenant, Landlord may, at its option, make such repairs or replacements, and Tenant shall repay the cost thereof to Landlord, together with a service charge in the amount of 5% of all expenses incurred by Landlord in connection therewith, within ten (10) days after Landlord makes a request therefor together with Interest from the date expended until repaid.

(b)    If any repair or replacement constitutes a Capital Repair, Tenant shall pay to Landlord, as Additional Rent, monthly installments of the annual amortization allowance of the cost of such Capital Repair as determined in accordance with generally accepted accounting principles ("GAAP"). Such payments shall be due at the same time that scheduled Base Rent payments are due.

(c)    As used in this Lease, "Capital Repair" or "Capital Repairs" means a repair or replacement of the Premises that constitutes a capital expenditure as defined under GAAP.

(d)    Landlord shall contract for any Capital Repairs which Landlord determines in its sole discretion are necessary and Tenant shall cooperate with Landlord and Landlord's contractors in connection with any such Capital Repairs and Tenant shall reimburse Landlord for Capital Repair Costs as set forth in this Lease.

## 13.    Tenant-Made Alterations and Trade Fixtures.

(a)    Tenant may make alterations and improvements to the Premises that are not structural, do not affect the mechanical, electrical or plumbing systems within the Premises and will not diminish the value of the Premises at the expiration of the Lease Term. Tenant may not make any other alterations or improvements to the Premises without the prior written consent of Landlord unless such alterations or improvements are completed at a cost of less than $10,000 and do not require the issuance of a building permit by any governmental entity, in which event,

Lease Agreement – Page 14

Landlord's consent shall not be required. Any alterations or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall become part of the Premises. In the event that Tenant desires to make any Tenant-Made Alterations, whether or not the consent of Landlord is required, Tenant shall submit plans and specifications therefore to Landlord not less than fifteen (15) days prior to the commencement of construction of such Tenant-Made Alterations, and if Landlord has any comments thereto, Tenant shall cause the plans and specifications to be revised in accordance with Landlord's reasonable comments. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed at Tenant's sole cost and expense, in accordance with the plans and specifications approved by Landlord, in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only materials consistent with the quality of the existing improvements shall be used. Within thirty (30) days following completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord as built plans and specifications with respect for the Premises including the Tenant-Made Alterations. Tenant, at its own cost and expense and without Landlord's prior approval, may install or erect such cabling, shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Upon Landlord's election, made at the time of Landlord's approval of the plans and specifications for Tenant-Made Alterations, Tenant, at its expense, shall remove all such Tenant-Made Alterations designated to be removed and its Trade Fixtures and shall immediately repair any damage caused by such removal, prior to the expiration or earlier termination of this Lease. Notwithstanding anything in the foregoing, implied or expressed to the contrary, Landlord has not consented to any work that would permit the making of any claim against Landlord or the Premises in respect thereof. If any present or future improvements to the Premises are made or authorized to be made by Tenant, its agents or employees, and such improvements shall encroach upon any property or street adjacent to the Premises, or shall violate any agreement or condition contained in any restrictive covenant affecting or applicable to the Premises, or shall impair the rights of others under any easement or right-of-way to which the Premises are subject, then upon request of Landlord, Tenant, at its cost and expense, shall take such action as shall be necessary to remove such encroachments or end such violation or impairment. Nothing herein shall impact Tenant's rights under that certain Work Letter Agreement attached hereto as Exhibit B.

(b) Tenant may (i) install a satellite dish/antenna on the roof of the Premises, (ii) construct an exterior dining area, and/or (iii) construct a new covered outdoor smoking patio, to the extent that each of the foregoing is either included as part of Tenant's Work, or following the completion of Tenant's Work, such installation or construction is performed in accordance with all requirements for Tenant-Made Alterations and all applicable Legal Requirements. Tenant may use its own contractor for such installation or construction (so long as such contractor is satisfactory to Landlord); provided, however, that Tenant shall use Landlord's roofing contractor if there are any penetrations of the roof to be made in connection with such

Lease Agreement – Page 15

installations, so as not to violate the terms of any roof warranty. Tenant shall submit plans and specifications to Landlord for its approval prior to installing any equipment on the roof of the Premises or commencing any construction. Prior to commencing any installation or construction permitted by this subsection (b), the contractor shall provide evidence of insurance which satisfy the requirements set forth in the Work Letter attached to this Lease.

(c)     Tenant shall have the right, at Tenant's sole cost, to use any existing, or to install a new, emergency generator, generator pad and uninterruptible power supply ("Generator Equipment"), subject to Tenant's compliance with all applicable Legal Requirements, and in the event of the installation of a new Generator Equipment, such installation is installed at a location to be mutually agreed upon by Landlord and Tenant in accordance with plans and specifications approved in writing in advance by Landlord. Tenant shall be responsible for the maintenance and repair of any such Generator Equipment in good and clean operating condition and repair in accordance with all applicable Legal Requirements. Tenant shall be liable for any and all costs, liabilities, expenses, damages and claims relating to the installation, use, maintenance, repair, replacement and/or removal of such Generator Equipment, including without limitation, including the cost of any screening reasonably required by Landlord, and any environmental issues related to the Generator Equipment. Tenant shall repair any damage to the Premises arising from or in connection with the Generator Equipment. If Tenant installs a new Generator Equipment, upon the expiration or any earlier termination of this Lease and the satisfaction of all of Tenant's obligations in the Lease, Tenant may, following the giving of prior written notice to Landlord, remove the Generator Equipment in accordance with all applicable Legal Requirements. If Tenant gives such notice to Landlord, Tenant shall, at Tenant's sole cost and expense, restore the Premises to the condition that existed prior to such installation. If Tenant does not give such notice to Landlord, Tenant shall be deemed to have abandoned the Generator Equipment and shall have no further rights thereto.

(d)     Tenant may request that the Wichita Falls Transit System ("Transit Authority") establish a temporary public bus stop at the Premises for public transit service for the benefit of Tenant prior to the expiration or any earlier termination of the Lease Term while Tenant is occupying the Premises for the Permitted Use. If any facilities are required to be installed on the Premises for such bus stop, such installation shall be subject to Tenant's satisfaction of requirements for Tenant-Made Alterations and applicable Legal Requirements. Nothing in this subparagraph (d) is, or is intended to be, a dedication of any right or interest to the public. No easement or other legal right is granted to the Transit Authority or any other governmental entity to use any of the Premises for public transit service by virtue of this Lease. Tenant shall repair any damage to the Premises arising from or in connection the installation and operation of a bus stop on the Premises, including, without limitation, the maintenance, repair and replacement of the parking lot. Tenant shall remove all bus stop facilities from the Premises prior to the expiration or any earlier termination of this Lease.

14.     **Signs**. Tenant, but not any assignee or sublessee of Tenant, at Tenant's sole cost and expense (but which is subject to reimbursement from the Allowance as set forth in the Work Letter), shall be entitled to construct and/or install monument and Building signage, subject to

Lease Agreement – Page 16

satisfaction of requirements for Tenant-Made Alterations and applicable Legal Requirements. All exterior signs shall be subject to Landlord's approval and conform in all respects to all applicable laws, codes, ordinances, building and zoning regulations and any other government regulations or restrictive covenants.

### 15.    Assignment and Subletting

(a)    Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Paragraph, a direct or indirect transfer of substantially all of the ownership interests or the control of Tenant shall be deemed an assignment of this Lease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease, represented in Section 15 (d). Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the Rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the Rent payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant.

(b)    In determining whether to grant consent to Tenant's request to a sublet or assignment, Landlord may consider any factor or factors which Landlord deems appropriate, in Landlord's absolute and sole discretion. Landlord and Tenant hereby agree and stipulate that any one or more of the following factors, or any other factor, shall be deemed to be sufficient grounds, but shall not be the exclusive grounds, for Landlord's deciding to approve or deny Tenant's request to sublet, assign, or otherwise transfer the Premises, or any portion thereof: (i) the financial strength, stability, experience, and/or responsibility of the proposed subtenant or assignee; (ii) the business character or reputation of the proposed subtenant or assignee; (iii) the use of the Leased Premises by the proposed assignee or subtenant and the use permitted by this Lease; (iv) any potential violation of any laws, ordinances or government regulations; (v) any potential violation of any agreements, covenants, easements, restrictions, or other matters affecting the Premises or Landlord; (vi) whether Tenant is in default or has failed to timely fulfill any of Tenant's obligations under the terms of this Lease; (vii) whether such assignment or sublease would increase the likelihood of damage or destruction or be likely to cause an increase in insurance premiums for insurance policies applicable to the Premises; (viii) any potential increase the electrical or HVAC usage in the Premises; (ix) a potential adverse impact on the Premises, the Building, the Land, or Landlord's interest therein; and (x) the failure or refusal to consent to such assignment or sublease by any ground lessor or mortgagee whose consent to such transfer is required. Provided however, notwithstanding anything to the contrary in this

Lease Agreement – Page 17

paragraph (b), Landlord agrees not to unreasonably withhold, condition or delay consent to Tenant's request for consent to the assignment of this Lease or the sublease of all of the Premises if (x) the Premises will continue to be used for the Permitted Use only, and (z) the financial strength of the proposed assignee or subtenant, based on financial statements and financial information (in form and substance acceptable to Landlord in its sole discretion) delivered to Landlord, are at least equivalent to the financial statements of Tenant provided to Landlord prior to the Effective Date of this Lease.

(c)     If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect Rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding Paragraph, apply the amount collected to the Rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of Rent for application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties or obligations hereunder.

(d)     If Tenant assigns the Lease or sublets the Premises or requests the consent of Landlord to any assignment or subletting or if Tenant requests the consent of Landlord for any act that Tenant proposes to do, then Tenant shall deliver to Landlord at the same time as the written notice required under Paragraph 15, an administrative fee of One Thousand and 00/100 Dollars ($1,000.00) plus any attorneys' fees reasonably incurred by Landlord in connection with such act or request.

(e)     Notwithstanding anything to the contrary in this paragraph 15, Tenant shall be entitled to engage a third party vendor to run Tenant's break room operations in the Premises. Landlord shall not be entitled to any profit sharing from such vendor's operations.

**16.     Inspection and Access.**  With at least twenty-four (24) hours' prior notice to Tenant (except in the event of an emergency in which case no prior notice is required), Landlord and its agents, representatives and contractors may enter the Premises at any reasonable time to inspect the Premises, to make such repairs as may be required or permitted pursuant to this Lease, to show the Premises to prospective buyers and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers and, during the last year of the Lease Term, to prospective tenants. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or for sale. Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Premises, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions. Notwithstanding anything to the contrary in this

Lease Agreement – Page 18

Lease, during the 180 day period prior to the expiration of the Lease Term or following the date that Tenant ceases its operations within the Premises, Landlord shall have reasonable access to all parts of the Premises for the purpose of showing the Premises to prospective tenants or purchasers by providing notice thereof to Tenant.

**17.    Surrender.**  Upon the expiration of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by the Restoration and Condemnation Paragraphs excepted.  Any Trade Fixtures, Tenant-Made Alterations and property which Tenant is permitted to remove but which is not removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property.  All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, and obligations concerning the condition and repair of the Premises.

**18.    Holding Over.**  If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such holding over or possession shall constitute a tenancy at sufferance, such holding over or possession shall be subject to immediate termination by Landlord at any time, in accordance with applicable law, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to 150% of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease.  In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided.

**19.    Events of Default.**  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)    Tenant shall fail to pay any installment of Base Rent, Additional Rent or any other payment required herein within five (5) days from when due.

(b)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within sixty (60) days of its filing or entry; or (iv) die or suffer a legal

Lease Agreement – Page 19

disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease, or Tenant shall fail to maintain such insurance in accordance with the provisions of this Lease.

(d)    Tenant shall not occupy or shall vacate the Premises or shall fail to continuously operate its business at the Premises for the Permitted Use set forth herein, during the last 24 months of the initial Lease Term or the last 24 months of any renewal or extension term, whether or not Tenant is in monetary or other default under this Lease.

(e)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease and caused as a result of any acts or omissions by Tenant within thirty (30) days after any such lien or encumbrance is filed against the Premises.

(g)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph, and except as otherwise expressly provided therein, such default shall continue for more than thirty (30) days after Tenant's receipt of written notice from Landlord of such default.  However, if Tenant's failure to perform its obligations under this Lease is of the nature that it cannot be cured within the 30-day grace period but reasonably could be cured within 60 days, then Tenant shall have additional time, not to exceed an additional 60 days, in which to cure such default, provided that Tenant has diligently commenced to cure such default during the 30-day grace period and diligently pursues the cure of such default.

## 20.    Landlord's Remedies.

(a)    Upon each occurrence of an Event of Default, Landlord may at any time thereafter at its election terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to reenter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom.  If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises.

Lease Agreement – Page 20

(b)      If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: (i) all Base Rent, Additional Rent and all other amounts accrued hereunder to the date of such termination; (ii) the reasonable cost of reletting the whole or any part of the Premises, including without limitation, reasonable brokerage fees and/or reasonable leasing commissions incurred by Landlord, reasonable costs of removing and storing Tenant's or any other occupant's property, reasonable costs of repairing, altering, remodeling, or otherwise putting the Premises into condition acceptable to a new tenant or tenants; (iii) all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and (iv) the then present value of the Base Rent, Additional Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease.  Such present value shall be calculated at a discount rate equal to the 90-day U. S. Treasury bill rate at the date of such termination.

(c)      If Landlord terminates Tenant's right of possession (but not this Lease), Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant; provided, however, that Landlord shall use commercially reasonable efforts to mitigate its damages.  For the purpose of such reletting Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable without notice to Tenant.  If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the Rent reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent, Additional Rent and other amounts accrued hereunder at the time from time to time.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(d)      Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof.  The failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same.  Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default.  A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "reenter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings.  Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine

Lease Agreement – Page 21

(including, without limitation, a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

(e)     In addition to the statutory Landlord's lien, Landlord shall have at all times and is hereby granted a valid contractual security interest to secure payment of all rentals and other sums of money becoming due hereunder from Tenant, and to secure payment of any damage or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein, upon all goods, wares, equipment, fixtures, furniture, improvements, inventory, accounts, contract rights, chattel paper, and other personal property of Tenant presently or which may hereafter be situated in, on or about the Premises and all proceeds therefrom, including, but in no way limited to or by, insurance payable by reason of loss or damage to such property, and such property shall not be removed therefrom without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged and all of the covenants, agreements and conditions hereof have been fully complied with and performed by Tenant. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements, inventory, accounts, contract rights, chattel paper, and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale(s) Landlord or its assigns may purchase unless otherwise prohibited by law. Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice shall be met if such notice is given at least five (5) days before the time of sale. Such notice shall be deemed to be delivered if personally delivered or when deposited in the United States Mail, postage prepaid, certified or registered mail (with or without return receipt requested) addressed to the parties hereto at the addresses as shown herein, whether or not actually received. The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding, storing and selling of the property (including reasonable attorneys' fees and other expenses) shall be applied as a credit against the indebtedness secured by the security interest granted herein. Any surplus shall be paid to Tenant or as otherwise required by law; and the Tenant shall pay any deficiencies forthwith. Tenant authorizes Landlord to file in the applicable records such financing statements as may be required or deemed appropriate by Landlord to evidence and/or perfect such security interest. The statutory lien for rent is not hereby waived, the security interest herein granted being in addition and supplementary thereto. Upon Tenant's written request, Landlord agrees to subordinate Landlord's security interest and lien in favor of a lender financing furniture, fixtures or equipment located or to be located upon the Premises by executing a written subordination agreement in form and substance satisfactory to Landlord in Landlord's sole discretion.

(f)     In the event Tenant defaults in the performance of any of the terms of this Lease and Landlord employs an attorney in connection therewith, Tenant agrees to pay Landlord's reasonable attorneys' fees arising in connection therewith and/or the enforcement by Landlord of any of its rights or remedies under this Lease.

(g)     The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement herein, or to exercise any option, right, power or remedy contained in the Lease shall not be construed as a waiver or a relinquishment thereof for the future.  No act or thing done by Landlord or its agents during the term hereof shall be deemed an acceptance or surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless in writing and signed by Landlord.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of rent due under this Lease shall be deemed to be other than on account of the earliest rent due hereunder, or portion thereof, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**21.     Limitation of Liability of Landlord.**

(a)     In the event of any default by Landlord under this Lease, Tenant shall not be entitled to exercise any right or remedy as a result of such default (i) until Tenant has notified in writing Landlord and the holder of any mortgage or deed of trust which at the time shall be a lien on the Premises, if the name and address of such holder shall previously have been furnished by written notice to Tenant, of such default, and (ii) until a reasonable period for remedying such default shall have elapsed following the giving of such notice, provided Landlord or such holder, with reasonable diligence, shall have commenced to remedy such default or to cause the same to be remedied.  In the event such default is not remedied by Landlord or the holder of any mortgage or deed of trust, then the sole remedy of Tenant with respect to such default shall be to institute proceedings to recover from Landlord (subject to the other provisions of this Lease) any actual damages incurred by Tenant as a result of such default, it being agreed and understood that Tenant shall have no (and hereby expressly waives any) right to recover from Landlord any punitive, exemplary, treble and speculative damages as a result of any default by Landlord under this Lease.

(b)     All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter.  The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership and provided further that such new owner assumes all obligations of Landlord under the Lease.  Landlord agrees that if Tenant timely pays the Rent and performs the terms and

Lease Agreement – Page 23

provisions hereunder, Tenant shall hold the Premises during the Term, free of lawful claims by any party acting by or through Landlord, subject to all other terms and provisions of this Lease.

(c)    The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Land, as then encumbered, and Tenant agrees to look solely to Landlord's interest in the Building and the Land, as then encumbered, for recovery of any judgment from Landlord, it being intended that Landlord shall not be personally liable for any judgment or deficiency. In no event shall any officer, partner or shareholder in Landlord, or their respective officers, directors, employees or trustees have or incur any personal liability for the payment or performance of any obligations of Landlord hereunder.

22.    **Waiver of Jury Trial.** TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

23.    **Subordination** Tenant accepts this Lease subject and subordinate to any ground lease, mortgage, deed of trust or other lien presently existing or hereafter arising upon the Premises or the Building, to any renewals, refinancing and extensions thereof, to zoning ordinances, building and fire ordinances, and governmental regulations relating to the use of the Premises, and to all easements, covenants, conditions and restrictions affecting the Premises. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, subject to Tenant's reasonable approval, confirming such subordination and such instruments of attornment as shall be requested by any such holder, provided, however, that such instruments provide that Tenant's possession of the Premises under the Lease shall not be disturbed by such holder in the exercise of any of its foreclosure rights under any mortgage or conveyance in lieu of foreclosure, so long as the Lease is in full force and effect and Tenant is not in default in the payment of rent, additional rent or other payments or in the performance of any of the other terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond the period, if any, specified in the Lease within which Tenant may cure such default). Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

24.    **Mechanic's Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in the Premises or to charge the Rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will indemnify and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

25.    **Certificates to Be Provided by Tenant**.

(a)    Certificate of Acceptance. Upon tender of possession of the Premises to the Tenant and as often thereafter as may be requested by Landlord, Tenant will, within ten (10) days after Landlord makes a request therefor, execute, acknowledge and deliver to Landlord a statement in form acceptable to Landlord which will (i) set forth the actual Commencement Date and expiration date of the Lease Term, and (ii) contain acknowledgments that Tenant has accepted the Premises and that at that time the Premises was satisfactory in all respects. Tenant's failure to execute and deliver such statement shall not affect or delay the Commencement Date or Tenant's obligation to pay rent under this Lease at the time and in the manner set forth herein.

(b)    Estoppel Certificates. Tenant agrees, from time to time, within five (5) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, in the form attached hereto as **Exhibit D** or any other estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which Rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the expiration date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within five (5) business days after Landlord's written request thereof.

(c)    Financial Statements. It is understood by Tenant that Landlord is relying upon the current financial condition and credit position of Tenant (hereinafter defined) and that such condition is a material factor in Landlord's decision to enter into the Lease. Tenant expressly acknowledges that it has made a full, complete and accurate financial disclosure to Landlord and that Tenant has represented and hereby represents to Landlord that Tenant is of sound financial

Lease Agreement – Page 25

condition. Tenant shall, upon demand from Landlord, deliver to Landlord from time to time, but not more than once annually, within ten (10) business days following request, a balance sheet and financial statement of Tenant as of a date not more than ninety (90) days prior to the first day of the month during which said request is made, duly certified by the president or chief financial officer of Tenant, as applicable, to accurately present the financial position of Tenant as of the date of such balance sheet. Such statements shall be prepared in accordance with generally accepted accounting principles and shall be audited by an independent certified public accountant. If Tenant fails to deliver its balance sheet and financial statement in accordance with the provisions of the preceding sentence, Tenant shall be in default under the provisions of the Lease. The obligation of Tenant under this section is a material obligation of Tenant's tenancy under the Lease.

### 26.    Miscellaneous.

(a)    Force Majeure. Neither Landlord nor Tenant shall be held responsible for delays in the performance of its obligations hereunder (excluding however, Tenant's obligation to pay Rent or any other monetary obligation arising under this Lease) when caused by strikes, lockouts, unusual weather, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

(b)    Entire Agreement. This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

(c)    Severability. Each provision contained in this Lease shall be construed to be separate and independent and the breach of any provision by Landlord shall not discharge or relieve Tenant from Tenant's obligation to observe and perform each of its obligations under this Lease. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(d)    Brokers. Except as hereinafter provided in this subparagraph, Landlord and Tenant each represents and warrants to the other that neither it nor its officers, employees or agents has contracted for any real estate commissions, nor has it, without the knowledge of the

Lease Agreement – Page 26

other, contacted real estate agents or brokers other than Broker and Cooperating Broker (defined below).

(i)    Landlord agrees to pay, in connection with this transaction, and to indemnify and save Tenant harmless against any and all claims for brokerage commissions (other than any commission due and payable to Cooperating Broker), finder's fees or the like (including attorneys fees or other costs incurred by Tenant) arising or allegedly arising through Landlord.

(ii)    Tenant agrees to pay, in connection with this transaction, and to indemnify and save Landlord harmless against any and all claims for brokerage commissions, finder's fees or the like (including attorneys fees or other costs incurred by Landlord) arising or allegedly arising through Tenant.

(iii)    Landlord agrees to pay CBRE (the "Broker") a real estate commission pursuant to Landlord's separate agreement with Broker. Tenant acknowledges that Landlord shall not be responsible for the payment of any commissions to any other brokers and agrees that any agreement to divide the commission due Broker with Site Selectors Inc. (the "Cooperating Broker") is subject to Broker and Cooperating Broker entering into a binding agreement to divide the commission.

(e)    Joint and Several Liability. If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(f)    Notices. All notices required or permitted to be given under this Lease shall be in writing and shall be sent by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses specified in the Basic Lease Terms and Information section of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices, except that Landlord may in any event use the Premises as Tenant's address for notice purposes. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery. Any notice required or permitted to be given hereunder must be in writing and may be given by personal delivery or by mail, or by receipt confirmed facsimile transmission or by electronic mail, provided a copy is also delivered by personal delivery or mail. Notices given by mail shall be deemed sufficiently given if sent by registered or certified mail addressed to Tenant at the Premises, or to Landlord at its address designated in Paragraph 1. Notwithstanding any provisions hereof to the contrary, notices required by law regarding unlawful detainer and other legal proceedings need be given only in the manner required by law. Notices personally delivered hereunder shall be deemed given when delivered and notices mailed hereunder shall be deemed given on the third calendar day after deposit in the United States Mail. Notices transmitted by facsimile or electronic mail shall be deemed delivered upon telephone confirmation of receipt thereof.

Lease Agreement – Page 27

(g)    Landlord's Reserved Rights. Landlord reserves and may exercise the following rights without affecting Tenant's obligations hereunder: (i) to retain at all times keys to the Premises; and (ii) to grant easements with respect to the Premises, provided, however, that any such easement does not in any way impair Tenant's use of the Premises or otherwise impair Tenant's rights under this Lease.  Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(h)    Memorandum of Lease. Neither this Lease nor any memorandum hereof shall be filed in any public record unless otherwise agreed in writing by Landlord and Tenant.

(i)    Rules of Construction. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(j)    Submission of Lease. The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(k)    Gender; Captions. Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(l)    Governing Law. Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises are located, excluding any principles of conflicts of laws.

(m)    Time of Essence. Time is of the essence as to the performance of Tenant's obligations under this Lease.

(n)    Tenant Authority  In the event Tenant is a corporation (including any form of professional association), partnership (general or limited), or other form of organization other than an individual, then each individual executing or attesting this Lease on behalf of Tenant hereby covenants, warrants and represents: (i) that he is duly authorized to execute or attest and deliver this Lease on behalf of Tenant in accordance with the organizational documents of Tenant; (ii) that this Lease is binding upon Tenant; (iii) that Tenant is duly organized and legally existing in the state of its organization, and is qualified to do business in the State of Texas; (iv) that upon request, Tenant will provide Landlord with true and correct copies of all organizational documents of Tenant, and any amendments thereto; and (v) that the execution and delivery of this Lease by Tenant will not result in any breach of, or constitute a default under any mortgage,

Lease Agreement – Page 28

deed of trust, lease, loan, credit agreement, partnership agreement or other contract or instrument to which Tenant is a party or by which Tenant may be bound.  If Tenant is a corporation, Tenant will, simultaneously with Tenant's execution of this Lease, deliver to Landlord a copy of a resolution of Tenant's board of directors authorizing or ratifying the execution and delivery of this Lease, which resolution will be duly certified to Landlord's satisfaction by the secretary or assistant secretary of Tenant.

(o)    Exhibits and Addenda.  All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

*SIGNATURE PAGE FOLLOWS*

Lease Agreement – Page 29

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

> **LANDLORD:**
>
> SANDALWOOD PACIFIC, L.P.,
> a Texas limited partnership
>
> By:   Sandalwood Group, LLC,
>       a Texas limited liability company,
>       its General Partner
>
>       By:   Tung Te Corporation,
>             a Hawaii corporation, its Manager
>
>             By: _____
>                 Jeffrey M. C. Lum
>             Title: Assistant Vice President

Execution Date:  11/15/16

> **TENANT:**
>
> USA 800, INC.
>
> By: _____
>
> Title:    CEO

Execution Date:  11/11/16

EXHIBIT A

LEGAL DESCRIPTION OF LAND

Lot 1B, Block 1, Airport Addition, an addition to the City of Wichita Falls, Wichita County, Texas, according to the Plat thereof recorded in Volume 27, Page 1058-1059, Wichita County Plat Records, and being a tract of land situated in the R. Brown Survey, Abstract No. 52.

**Exhibit "A"**

EXHIBIT B

**WORK LETTER AGREEMENT**

This Work Letter Agreement is attached to and forms a part of the Lease Agreement (the "Lease") dated November 1, 2016, between SANDALWOOD PACIFIC, L.P., a Texas limited partnership ("Landlord") and USA 800, Inc., a Missouri corporation ("Tenant"), covering the Premises described therein, known as 2233 Airport Drive, Wichita Falls, Texas 76306.

1.      Tenant's Plans. If necessary, Tenant shall employ an architect approved by Landlord and duly licensed to practice in the State of Texas ("Tenant's Architect"), who shall prepare and submit to the Landlord plans, specifications and drawings describing Tenant's desired improvements to the Premises or designated portions thereof together with CAD and PDF copies ("Plans"). The Plans shall be subject to the prior written approval of Landlord. Landlord's approval of such Plans shall not render Landlord liable or responsible to Tenant or any other party for any defects or deficiencies in such Plans or any improvements constructed pursuant to the terms thereof. Notwithstanding the foregoing, Landlord's right of approval or disapproval shall be limited to any items which (i) affect the Building's HVAC, electrical, mechanical, structural, fire & life safety systems, (ii) affect the exterior materials or design of the Building or (iii) are visible from the outside of the Building. Within five (5) business days after receipt of the Plans from Tenant, Landlord shall either (a) approve the Plans by written notice to Tenant, or (b) deliver to Tenant a written list of any changes reasonably required. Failure to respond in accordance with the preceding sentence within the required five (5) day period shall be deemed to constitute approval of the Plans as submitted. Tenant and Tenant's Architect shall be solely responsible for compliance with all applicable legal requirements, including without limitation building and fire codes applicable to the Premises.

2.      Construction. Tenant will cause the leasehold improvements described in the Plans approved by Landlord to be constructed shall pay for improvements or fixtures for the Premises, which improvements may include the installation and implementation of certain technology and software related to Tenant's business to be conducted at the Premises (provided such improvements are either included in such approved Plans or otherwise approved in writing by Landlord) (collectively, "Tenant's Work") at Tenant's sole cost and expense (together with any amounts funded by the Wichita Falls Economic Development Corporation) and in accordance with applicable legal requirements. Following commencement of Tenant's Work, Tenant shall diligently pursue the same to completion.

        (a)      Permits. In connection with Tenant's Work, Tenant, or the Contractor, shall file all drawings, plans and specifications pay all fees and obtain all permits and applications from any authorities having jurisdiction, including, without limitation, the permanent certificate of occupancy. Tenant shall obtain all other approvals required of Tenant to use and occupy the Premises and to open for business with the public.

        (b)      Approval. Prior to the commencement of Tenant's Work, Tenant shall obtain bids and select a contractor, reasonably acceptable to Landlord, to be the "Contractor" performing the Tenant's Work. Landlord's approval of the Contractor may not be unreasonably withheld

EXHIBIT "B" - **WORK LETTER AGREEMENT** Page 1

or delayed.  Following such selection and approval from Landlord, Tenant shall then enter into a construction contract for Tenant's Work or the applicable stage thereof (each a "Construction Contract") with such Contractor and Tenant shall furnish a copy thereof to Landlord and when available, the names of all subcontractors or suppliers furnishing labor or materials for Tenant's Work in excess of $10,000.

(c)    Insurance.  The Contractor and subcontractors shall be required to provide, in addition to the insurance required to be maintained by Tenant pursuant to the Lease, the following types of insurance and the following minimum amounts, and to the extent permitted by law, naming Landlord and any other persons having an interest in the building (including Tenant) as "additional insureds" or "as their interests may appear", issued by companies and in form and substance approved by Landlord:

(i)    Workman's Compensation coverage with limits of at least $500,000.00 for the employer's liability coverage thereunder.

(ii)    All Risk Builders Risk on 100% Completed Value, covering damage to the construction and improvements to be made by Tenant with 100% coinsurance protection.

(iii)    Automobile Liability coverage with bodily injury limits of at least $1,000,000.00 per accident and $500,000.00 accident for property damage.

Original or duplicate policies for all of the foregoing insurance (or certificates thereof) acceptable to Landlord shall be delivered to Landlord before Tenant's Work is started and before any contractor's or subcontractor's equipment is moved on to any part of the Premises.

(d)    Liability During Construction.  Tenant hereby assumes any and all liability arising out of or relating to Tenant's Work after the date hereof, including any liability arising out of statutory or common law for any and all injuries to or death of any and all persons (including, without limitation, Tenant's contractors and subcontractors and their employees) and any liability for any and all damage to property caused by, or resulting from, or arising out of any act or omission on the part of the Tenant, Tenant's contractors and Tenant's or their subcontractors or employees in the performance of Tenant's Work, and Tenant further agrees to defend, indemnify and save harmless Landlord from and against all damages, claims, costs, liabilities, losses and/or expenses (including reasonable legal fees and expenses) arising out of or related to Tenant's Work, including without limitation any and all such injuries, death and/or damage. Tenant agrees to insure the foregoing assumed contractual liability in its liability policies and the original or duplicate original of said policy (or certificates thereof) that Tenant will deliver to Landlord shall expressly include said contractual liability coverage.

(e)    Removal during Construction.  Contractors and/or subcontractors participating in the Tenant's Work shall be required to keep the Premises and adjacent areas in a neat and clean condition and to remove and dispose of, as frequently as Landlord may direct in writing, all debris and rubbish caused by, or resulting from the work and upon completion, to remove all temporary structures, surplus materials, debris and rubbish of whatever kind remaining on any

EXHIBIT "B" - **WORK LETTER AGREEMENT** Page 2

part of the Premises or in proximity thereto that was brought in or created by the performance of Tenant's Work. If at any time Tenant's contractors and subcontractors shall neglect, refuse, or fail to remove any debris, rubbish, or surplus materials within twenty-four (24) hours after written notice to Tenant, Landlord may remove the same at Tenant's expense.

(f)     Changes.  All changes to the Plans shall be subject to Landlord's prior written approval, which approval may not be unreasonably withheld or delayed.

(g)     Affidavits.  Tenant shall cause to be filed and/or recorded such affidavits as Landlord reasonably requests regarding Tenant's Work, including without limitation an affidavit of commencement of Tenant's Work and an affidavit of completion of Tenant's Work on the dates required by law to give proper effect thereto, or if requested in writing by Landlord, on the dates specified by Landlord.

3.     Removal of Tenant's Work at Expiration or Termination of Lease.  Tenant's Work (including any Changes) shall be the property of Landlord and shall remain upon and be surrendered with the Premises upon the expiration of the Lease term unless otherwise stated in the Lease.

4.     Conflicts and Conformity With Lease.  Any rights and obligations of Landlord and Tenant relative to any matter not stated in this Work Letter Agreement shall be governed by the Lease. If there shall be any conflict between this Work Letter Agreement and the Lease, the provisions of this Work Letter Agreement shall prevail.  As used herein, all capitalized terms not defined herein shall have the same meaning as defined in the Lease.

5.     Allowance.

(a)     Tenant's Work shall be done at Tenant's expense, including building permit fees, other fees, architectural and engineering expenses and other expenses relating to Tenant's Work. However, subject to compliance with the Lease and this Work Letter Agreement, Landlord shall provide Tenant an improvement allowance in the amount of $5.00 per rentable square foot of the Building ("Allowance") allocated as follows:

(i)     the design and construction of Tenant's Work;

(ii)     Tenant shall be permitted to draw from the Allowance to pay for Tenant's Work conforming to the Plans or any approved Change Order;

(iii)     any costs incurred by Landlord in connection with the review and approval of the Tenant's Architect, Tenant's Contractor, the Plans, Change Order or inspection of Tenant's Work, including, but not limited to, architectural and engineering fees and expenses, inspection fees and amounts paid to contractors;

(iv)     a fee equal to the following fee schedule for coordination of Tenant's Work; and:

EXHIBIT "B" - **WORK LETTER AGREEMENT** Page 3

Design, procurement, construction and post-construction services are based on the following percentages of the total project cost:

- A fee of 5% on first $100,000
- A fee of 3% on the next $300,000
- A fee of 2% on costs over $400,000

Reimbursable Expenses:

- $150 per visit to the Premises.
- Authorized printing.
- Special handling or expedited delivery services.

(v)      the cost of furnishings, fixtures and equipment for the Premises.

(b)      The proceeds of the Allowance shall be used solely for payment of eligible costs incurred in constructing the permanent leasehold improvements described in the Plans approved by Landlord or such other costs allowed in the preceding paragraph. Tenant understands that if the cost of Tenant's Work, including without limitation any changes in Tenant's Work, exceeds the Allowance, then Tenant shall be solely responsible for all such costs in excess of the Allowance and that such excess costs must be paid by Tenant prior to any advance of the Allowance to Tenant.

(c)      Any portion of the Allowance requested by Tenant for the cost of Tenant's Work shall be paid by Landlord to Tenant within thirty (30) days following the date that Tenant's Work is completed and, with respect to all of the following are received by Landlord, in form and substance reasonably acceptable to Landlord:

(i) a written request from Tenant for reimbursement of such costs and expenses as permitted under paragraph 5 of this Work Letter Agreement;

(ii) final releases or lien waivers and bills paid affidavits from Tenant, Tenant's Contractor, subcontractors and all other parties who have furnished materials or services or permitted labor in excess of $5,000 in connection with Tenant's Work;

(iii) a certificate of substantial completion from Tenant's project architect or other construction representative approved by Landlord;

(iv) all change orders to Tenant's Plans and all other drawings or plans and specifications used to perform Tenant's Work;

(v) two (2) sets of "as-built" plans reflecting Tenant's Work, (vi) copies of building permits and the final certificate of occupancy or equivalent evidencing Tenant's right to legally occupy the Premises,

EXHIBIT "B" - **WORK LETTER AGREEMENT** Page 4

(vii) an all bills paid affidavit from Tenant's general contractor reflecting payment of all sub-contractors and suppliers; and

(viii) if requested, an estoppel executed by Tenant in the form attached to this Lease as Exhibit D.

Any portion of the Allowance requested by Tenant for the payment of the cost of furnishings, fixtures and equipment for the Premises shall be paid by Landlord to Tenant within thirty (30) days following the date that the following are received by Landlord, in form and substance reasonably acceptable to Landlord:

(i) true and complete copies of all invoices or purchase orders paid by Tenant for furnishings, fixtures and equipment for the Premises; and

(ii) evidence of Tenant's payment of all amounts due under the invoices or purchase orders provided to Landlord pursuant to clause (i) above, in form and substance satisfactory to Landlord.

Tenant agrees that it will provide additional documentation at the request of Landlord should such documentation be reasonably required by Landlord's lender. Such additional documentation will be provided at no out-of-pocket cost or expense to Tenant and shall not be required as a condition of payment of the Tenant Improvement Allowance.

(d)    Upon the occurrence and during the continuation of any Event of Default or during the existence of any occurrence or event which, with the giving of notice and the passage of time, would constitute an Event of Default, Landlord shall have no obligation to fund or make any further disbursements of the Allowance.

(e)    Landlord shall have no obligation to disburse any of the Allowance after the date that is one year after the date of the Lease.

**LANDLORD:**                                      **TENANT:**

SANDALWOOD PACIFIC, L.P.,                          USA 800, INC., a Missouri corporation.
a Texas limited partnership

By:    Sandalwood Group, LLC,                      By:_____
       a Texas limited liability company,         Its:_____CEO_____
       its General Partner

By:    Tung Te Corporation,
       a Hawaii corporation, its Manager

       By:_____
       Title: _____

EXHIBIT "B" - **WORK LETTER AGREEMENT** Page 5

EXHIBIT C

OPTION TO EXTEND

(a)    If, at the end of the primary Lease Term, all rents, charges, late fees, damages and other amounts then due Landlord are paid in full and Tenant is not then in default of any of the terms, conditions or covenants of this Lease, Tenant, but not any assignee or subtenant of Tenant, is hereby granted an option to renew this Lease for one (1) term of sixty (60) months upon the same terms and conditions contained in this Lease with the following exceptions:

(1)    The renewal option term will contain no further renewal option unless expressly granted by Landlord in writing;

(2)    No Allowance or other amount attributable to leasehold improvements or otherwise shall be payable by Landlord to Tenant;

(3)    Tenant shall not be entitled to any abatement of Base Rent;

(4)    The Base Rent during the renewal term will be then prevailing "Fair Market Rental Rate" defined below in this Exhibit C; provided however, in no event will Base Rent for renewal term be less than the last year of the initial Lease Term.

(b)    As used in this Exhibit C, the term "Fair Market Rental Rate" or "FMRR" shall mean the current annual rent per square foot that a willing, comparable, full building user nonrenewal, non-sublease, non-expansion, nonequity tenant would pay, and a willing comparable landlord of like quality and comparable buildings found in Texas and/or Oklahoma would accept, at arm's length, for comparable space, giving consideration to incentives available from governmental, quasi-governmental or non-profit development company (such as The Economic Development Corporation of Wichita Falls) to such tenant, annual rental rates per square foot, escalation (including type, gross or net, and if gross, whether Base Year or Expense "Stop"), abatement provisions, reflecting free rent and/or no rent during the lease term, the building standard work letter, tenant improvement allowances, the age and location of the building, the location of the premises being leased, the quality of the construction of the building and the premises, the services provided under the terms of the leases, the types, quantity, quality, costs and location (on site, adjacent, off site, underground, above ground) of parking rights and obligations, and other generally applicable terms and considerations of tenancy for the space in question at or about the time that such Fair Market Rental Rate is deemed to take effect. If for any reason the parties cannot agree upon the FMRR, then FMRR shall be determined as provided in subsections (d) – (f) of this Exhibit C.

(c)    If Tenant desires to renew this Lease, Tenant shall provide Landlord with written notice of Tenant's intent to exercise said option no more than two hundred and forty (240) days and no less than one hundred eighty (180) days prior to the expiration of the then existing Lease Term. Landlord shall, within the fifteen (15) days after receipt of Tenant's notice, notify Tenant in writing of the proposed FMRR, and Tenant shall, within the next thirty (30) days following receipt of the proposed FMRR, notify Landlord in writing of its acceptance or rejection thereof. If Landlord and

Tenant agree on the renewal term FMRR during the thirty (30) day period, they shall immediately execute an amendment to this Lease stating the new monthly Base Rent.

(d)    If Landlord and Tenant are unable to agree on the FMRR for the renewal option term within such thirty (30) day period, then within ten (10) days after the expiration of the thirty (30) day period, Landlord and Tenant each, at its cost and by giving notice to the other party, shall appoint as its selected arbitrator a competent and disinterested broker or MAI appraiser with at least five (5) years' full-time commercial brokerage or appraisal experience in the geographical area of the Building to determine and set the FMRR during the option renewal term.  If either Landlord or Tenant does not appoint an arbitrator within ten (10) days after the other party has given notice of the name of its arbitrator, the single arbitrator appointed shall solely set such FMRR.  If two (2) arbitrators are appointed by Landlord and Tenant as stated in this subsection (d), they shall meet promptly and attempt to set the FMRR for the option renewal term.  If the two (2) arbitrators are unable to agree within thirty (30) days after the arbitrators have been appointed, they shall attempt to select a third arbitrator, who shall be an MAI appraiser meeting the qualifications stated in this subsection (e) within ten (10) days after the last day the two (2) brokers/appraisers are given to set the FMRR.  If they are unable to agree on the third arbitrator, either Landlord or Tenant, by giving ten (10) days' notice to the other party, can apply to the then president of the real estate board of the county in which the Building is located, or to the Presiding Judge of the Superior Court of the county in which the Building is located, for the selection of a third arbitrator who is an MAI appraiser meeting the qualifications stated in this Paragraph.  Landlord and Tenant each shall bear one-half (1/2) of the cost of appointing the third arbitrator and of paying the third arbitrator's fee. The third arbitrator, however selected, shall be a person who has not previously acted in any capacity for either Landlord or Tenant.

(e)    Within thirty (30) days after the selection of the third arbitrator, a majority of the arbitrators shall set the FMRR for the option renewal term.  If a majority of the arbitrators is unable to set the FMRR within the stipulated period of time, Landlord's arbitrator shall arrange for simultaneous exchange of written rent determinations from each of the arbitrators and the three (3) rent determinations shall be added together and their total divided by three (3); the resulting quotient shall be the monthly Base Rent for the Premises during the option renewal term.  If, however, the low rent determination and/or the high rent determination are/is more than ten percent (10%) lower and/or higher than the middle rent determination, the low rent determination and/or the high rent determination shall be disregarded.  If only one (1) rent determination is disregarded, the remaining two (2) rent determination shall be added together and their total divided by two (2); the resulting quotient shall be the FMRR for the Premises during the option renewal term.  If both the low rent determination and the high rent determination are disregarded as stated in this subsection, the middle rent determination shall be the FMRR for the Premises during the renewal term.  Provided however, notwithstanding anything to the contrary in this Exhibit C, in no event will Base Rent for renewal term be less than the last year of the initial Lease Term.

(f)    After the Base Rent for the option renewal term has been set, the appraisers shall immediately notify Landlord and Tenant, and Landlord and Tenant shall immediately execute an amendment to this Lease stating the monthly Base Rent.

EXHIBIT "C" - OPTION TO EXTEND - Page 2

(g)    Notwithstanding the foregoing, should Landlord and Tenant extend the primary Lease Term of this Lease prior to its termination pursuant to a written modification or amendment, this Renewal Option shall be of no further force or effect.

(h)    For purposes hereof, the term "Fair Market Rental Rate" or "FMRR" shall mean the current annual rent per square foot that a willing, comparable, full building user nonrenewal, non-sublease, non-expansion, non-equity tenant would pay, and a willing comparable landlord of like quality and comparable buildings found in the United States would accept, at arm's length, for comparable space, giving consideration to annual rental rates per square foot, escalation (including type, gross or net, and if gross, whether Base Year or Expense "Stop"), abatement provisions reflecting free rent and/or no rent during the lease term, the building standard work letter, tenant improvement allowances, the age and location of the building, the location and floor levels of the premises being leased (giving full consideration to the distinction between the office and retail premises), the quality of the construction of the building and the premises, the services provided under the terms of the leases, the types, quantity, quality, costs and location (on site, adjacent, off site, underground, above ground) of parking rights and obligations, and other generally applicable terms and considerations of tenancy for the space in question at or about the time that such Fair Market Rental Rate is deemed to take effect.  If for any reason the parties cannot agree upon the FMRR, then FMRR shall be determined by appraisal arbitration.

EXHIBIT D

TENANT ESTOPPEL CERTIFICATE

(Date)

(Lender/Purchaser address)


RE:    Lease Agreement dated March 1, 2010 (the "Lease")
       2236 Airport Drive, Wichita Falls, Texas 76306 (the "Property")

Ladies and Gentlemen:

The undersigned is Tenant under the Lease.  Tenant certifies to _____
and its successors, transferees and assigns (collectively, *["Lender"]["Purchase"]*) and
acknowledges and agrees that:

1.     The following information concerning the Lease is true and correct:

Landlord:  _____. ("Landlord")

Tenant:  USA 800, Inc. ("Tenant")

Premises:  See Exhibit A *[attach legal description from Lease]*

Building Rentable Square Feet:  36,879

Amendments, Modifications, Assignments or Assumptions after lease execution:  None

Commencement Date:

Expiration Date of Term:

Monthly payments under the Lease:

Base Rent:  $_____ monthly

Renewal Option:  one (1) additional period of five (5) years

Security Deposit:  $_____

2.     The Lease contains the entire agreement between Landlord and Tenant with
respect to the subject matter thereof, has not been modified or amended except as indicated

above, no options to purchase or rights of first refusal are contained therein, and there are no other agreements between them, oral or written, regarding the Premises or the Property.

3.      The Lease (modified as indicated above) is presently in full force and effect in accordance with its terms and Tenant has accepted the Premises.

4.      All rent and additional rent payable under the Lease as of the date of this letter have been paid in full and no rent or additional rent to become payable under the Lease has been paid more than 30 days in advance.

5.      Except as set forth on Schedule 1 attached hereto, no party to the Lease is in default thereunder, and no event has occurred which, with the giving of notice or the passage of time, or both, would constitute a default thereunder.

6.      Except as set forth on Schedule 1 attached hereto, Tenant has no current right to counterclaims, defenses or offsets to its obligations under the Lease or to the enforcement of any of the landlord's rights thereunder.

7.      Landlord has completed all alterations, additions, painting and refurbishing to the Premises and the Property required to be performed by Landlord if any, and there are no rent concessions, rebates, free rents or similar inducements except as set forth in the Lease.

8.      The Lease is subject and subordinate to any and all existing and future mortgages and any ground lease of the Premises.

9.      Tenant acknowledges that if *[Lender][Purchaser]* succeeds to the interest of Landlord under the Lease, *[Lender][Purchaser]* shall not be liable for any act or omission of any prior landlord (including Landlord), liable for the return of any advance rental deposit or any security deposit (unless such sums have actually been received by *[Lender][Purchaser]* as security for Tenant's performance under the Lease), subject to any offset or defense which Tenant may have against any such prior landlord, unless specified above, or bound by any rent or additional rent Tenant may have paid for more than the current month, unless specified above.

10.     If *[Lender][Purchaser]* succeeds to the interest of Landlord under the Lease by any means, Tenant agrees to attorn to *[Lender][Purchaser]* and be bound to *[Lender][Purchaser]* under all the terms of the Lease on the condition that *[Lender][Purchaser]* does not disturb the possession of the Tenant under the Lease if the Lease is in full force and effect and the Tenant is not then in default under the Lease.

EXHIBIT "D" – TENANT ESTOPPEL CERTIFICATE – Page 2

Tenant acknowledges that *[Lender][Purchaser]* has requested this letter in connection with a proposed *[financing][purchase]* of the Premises, and that *[Lender][Purchaser]* may rely on the information set forth in this letter.

USA 800, Inc.

By:_____

Name:_____

Title:_____

EXHIBIT A TO TENANT ESTOPPEL

SCHEDULE 1 TO TENANT ESTOPPEL

## EXHIBIT E

## EARLY TERMINATION OPTION

1.      Tenant, but not any assignee or sublessee of Tenant, shall have a one (1) time right to terminate (the "Termination Right") this Lease effective on the date (the "Early Termination Date") which is forty eight (48) months after the Commencement Date, provided each of the following conditions has been satisfied:

(a) Tenant has given Landlord written notice (the "Termination Notice") of such termination at least twelve (12) months nor more than eighteen (18) months prior to the Early Termination Date and Tenant is not in default hereunder at the time Tenant gives such notice to Landlord or at any time thereafter prior to the Early Termination Date; and

(b) Tenant has paid to Landlord, on or before the Early Termination Date, the sum of the following:

(i) the unamortized value of the Allowance (as hereinafter defined), amortized over the scheduled Lease Term,

(ii) the unamortized value of commissions paid to Broker by Landlord in connection with this Lease, amortized over the scheduled Lease Term, and

(iii) a termination fee in an amount equal to three (3) times the Base Rent payable by Tenant for the final month prior to the Early Termination Date.

2.      In the event Tenant exercises the Termination Right pursuant to this Exhibit E, Tenant shall vacate the Premises no later than the Early Termination Date. Tenant will surrender possession of the Premises in accordance with Paragraph 17 of the Lease.

3.      Landlord's and Tenant's obligations which have accrued under this Lease prior to the Early Termination Date shall survive the termination of this Lease.

4.      In the event Tenant fails to surrender possession of the Demised Premises no later than five (5) days after the Early Termination Date, Tenant shall be subject to Section 18 of the Lease.

5.      Upon Tenant's performance of each of the obligations contained in this Exhibit E, neither Landlord nor Tenant shall have any further obligations or liabilities under this Lease, except for those which by their express terms survive termination of the Lease.

EXHIBIT "E" – EARLY TERMINATION OPTION – Solo Page

# Ex. B



KAMI K. BEATY
MICHAEL V. BOURLAND
NATALIE S. BRACKETT
BETHANY L. BROOKS
AUSTIN L. CALDERA
STEPHANIE M. DALEY
DAVID P. DUNNING
GRAIGORY B. FANCHER
EMILY B. GARZA
DAVID J. GOODMAN
BRYON R. HAMMER
SADIE HARRISON-FINCHER
PHILLIP A. HECKER
LISA H. JAMIESON

WILLIAM R. KORB
ALICIA D. MEINZER
ERIC J. MILLNER
DARREN B. MOORE
JEFFREY N. MYERS
JAY B. NEWTON
JEREMY R. PRUETT
KENDALL K. RYMELL
MEGAN C. SANDERS
ALLISON M. SKEES
ELLE W. WHITAKER
JULIAN E. WHITLEY
DUSTIN G. WILLEY

**BOURLAND, WALL & WENZEL**
P.C.
ATTORNEYS AND COUNSELORS

301 COMMERCE STREET, SUITE 2500
FORT WORTH, TEXAS 76102-4125
(817) 877-1088 | FAX: (817) 877-1636
WWW.BWWLAW.COM

**Email:** sharrisonfincher@bwwlaw.com

June 14, 2024

***Via FEDEX #776876410675***
***And via Email: paula.lagason@results-cx.com;***
***josh.harris@results-cx.com; and anadavila@results-cx.com***
ResultsCX
Attn: Paula Lagason, Josh Harris, and Ana Davila
100 NE 3rd Ave., Ste. 200
Fort Lauderdale, Florida 33301

  RE: Notice of Default under Lease Agreement between ResultsCX, as successor in interest to USA 800, Inc. ("**Tenant**") and Star Texan Properties LLC, as successor in interest to Sandalwood Pacific, L.P. ("**Landlord**") (as amended and assigned, the "**Lease**") for the building ("**Building**") located at 2236 Airport Dr., Wichita Falls, Texas 76306, containing approximately 36,879 rentable square feet ("**Premises**")

Dear Tenant,

  Please be advised that this law firm represents Landlord in connection with the above-referenced matter. All defined terms used, but not otherwise defined, herein shall have the meaning given to them in the Lease.

  As you know, pursuant to Section 17 of the Lease, Tenant is required to surrender the Premises to Landlord broom clean and in the same condition in which Tenant received the Premises at the beginning of the Lease (hereinafter generally referred to as "**Surrender Condition**") upon the expiration of the Lease Term.  Moreover, pursuant to Section 12(a) of the Lease, Tenant has the obligation to maintain all portions of the Premises in good condition and to replace, as necessary, including, without limitation, all or any portions of the heating, ventilation, and air conditioning ("**HVAC**") systems, fire suppression systems, security systems, and other Building systems serving the Premises throughout the Lease Term. Tenant also is solely responsible for maintaining and repairing, as necessary, the emergency generator, generator pad, and related equipment installed on the Premises in order to keep the same in good and clean operating condition and repair at its own cost under Section 13(c) of the Lease.

  To the extent there are any costs or damages imposed on or incurred by Landlord arising from an occurrence on the Premises taking place during the Lease Term or Tenant's failure to perform under the Lease, Tenant has an obligation to indemnify Landlord and take responsibility for such costs or damages to the Premises pursuant to Section 11(a) of the Lease, and Section 17 provides that this indemnity

Page 2
June 14, 2024

obligation, along with Tenant's obligation deliver the Premises in Surrender Condition survive the end of the Lease Term.

As you are aware, on or about April 25, 2024, certain third parties unlawfully accessed the Premises and stole a material amount of the equipment and personal property kept on the Premises, causing substantial damage to the Building and Building systems in the process. For instance, the vandals stripped all HVAC units, generators, and other critical equipment installed in the Building of all copper elements, rendering systems material to the continued use of the Building inoperable. This unauthorized access to the Premises was caused by Tenant's negligence, as, on the date of the break in, Tenant failed to enable the security system for the Building.

As you are further aware, the Lease expired on April 30, 2024 (the "**Expiration Date**"). Despite representatives of Tenant remaining in regular communication with Landlord via email in the months preceding the Expiration Date regarding Tenant's obligations with respect to returning the Premises to Landlord, Tenant failed to notify Landlord of the burglary of the Premises and the resulting significant damage caused to the Premises in violation of Section 9(b) of the Lease. Instead, on the Expiration Date, Tenant returned the Premises to Landlord without having made any attempts to repair the damage to the Premises caused by the vandals and demanded prompt repayment of the Security Deposit. Please find enclosed an estimate of the costs Landlord is being forced to incur in order to repair and/or replace the equipment servicing the Premises and bring the Premises into such condition as may permit the re-letting of the Premises to a new tenant. The total estimated replacement cost for all damaged items located on the Premises is $2,477,000.00.

Tenant's failure to return the Premises to Landlord at the end of the Lease Term in the condition required under Section 17 of the Lease is an Event of Default pursuant to Section 19(g) of the Lease. As of the date of this letter, Tenant has neither caused the restoration of the Premises and the improvements thereto to Surrender Condition nor paid Landlord an amount equal to the total costs Landlord must incur to restore the Premises to Surrender Condition. As such, by this letter, Landlord hereby notifies Tenant that the aforementioned Event of Default has occurred and is continuing. To the extent you may not be aware, although the Lease has expired, Tenant's default under the Lease for failure to surrender the Premises to Landlord in Surrender Condition remains actionable by Landlord and Tenant remains liable to Landlord for payment of the same.

By this letter, Tenant is hereby notified that Landlord is retaining the entire Security Deposit in the amount of $46,098.75 to partially cover the damages imposed on Landlord arising from Tenant's breach of the Lease. If full payment of all remaining unpaid costs required to bring the Premises to Surrender Correction in the aggregate amount of **$2,430,901.25** is not received by Landlord **within five (5) days** of the date of this letter, Landlord has instructed us to pursue any and all remedies available to it in accordance with the terms of the Lease and the laws of the State of Texas, including, without limitation, the right to seek monetary damages pursuant to Section 20(b) of the Lease. Payment of the **$2,430,901.25** may be delivered to Landlord at the following address:

Star Texan Properties, LLC
Attn: Ahmed Abdelghani
7025 Cedar Ridge Drive
Dallas, Texas 75236

Please be advised that if Landlord is required to file a lawsuit in connection with this matter, Landlord will seek, among other things, the recovery of its costs and attorneys' fees expended in connection

Page 3
June 14, 2024

with the litigation. Nothing set forth herein is intended, and shall not be deemed, to modify, limit, release, reduce, or waive any of Landlord's rights, remedies, or privileges under the Lease, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, nor shall it be deemed, to waive other defaults that may currently exist under the Lease.

Thank you for your prompt attention to this matter. Please do not hesitate to contact me should you have any questions. Both Landlord and I hope it will not be necessary to bring a lawsuit with respect to this matter, and I look forward to hearing from you **within five (5) days** of the date of this letter.

Sincerely,

BOURLAND, WALL & WENZEL, P.C.

Sadie Harrison-Fincher

SHF/KKR/527012.1

cc:     Client

Enclosure



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com

May 31, 2024

ATTN: Ahmed Abdelghani

Address
DataNovaX
2236 Airport Dr.
Wichita Falls, TX 76306

Alcatex, Inc. is pleased to provide the following proposal.

Project Name:

Incident Regarding Stolen and Damaged Items Remediation Proposal

Electrical Scope of Work:

Due to the extensive damage of multiple pieces of electrical equipment, conduit, and conductors, this estimate is based only on what we were able to see during the walk through and is for the replacement cost of some items and the possible repair of others. This could easily increase once work begins, and other issues are found.

Replacement: 2000-amp MDP, 2000-amp ATS, 100kW UPS, UPS Bypass Switch, Generator ATS feeders, Generator feeders, MDP feeders, UPS feeders, multiple panel board feeders, RTU feeders, and branch circuits.

Repair: Multiple runs of conduit, some electrical panels that are still mostly intact, branch circuit conductors that were cut but still salvageable.

Electrical Equipment Damaged / Destroyed:
• (x3) AHU's – 600,000 BTU (50-Ton) – Destroyed
YCD600AELE288NEIA
480v 3 Phase
• AHU Copper Lines - Removed
• MTU 600KW Deisel Generator – Heavily Damaged
• ATS – Destroyed
• UPS & Batteries – Destroyed (Batteries Stolen)
• TAP Can – Destroyed
• 400A Switch - Damaged
• Panel "LB" – Damaged
• Panel "PD" – Damaged
• Panel "LA" – Damaged
• Panel "ML" – Damaged
• Panel "MDP" – Damaged
• Panel "PB" – Damaged

DESIGN    •    ENGINEER    •    BUILD



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com

- Panel "EL" – Damaged
- Panel "CR" – Damaged
- Panel "UPA" – Damaged
- Panel "UPC" – Damaged

Electrical Feeder Wire Stolen:
100' ATS to MDP 6x600 KCMIL – 3 Phase 4W + Ground
150' MDP to W/AC 1x500 KCMIL – 3 Phase 4W + Ground
150' MDP to c/AC 1x500 KCMIL – 3 Phase 4W + Ground
200' MDP to "LB" 1x500 KCMIL – 3 Phase 4W + Ground
200' MDP to "PD" 1x4/0 – 3 Phase 4W + Ground
50' MDP to "LA" 1x4/0 – 3 Phase 4W + Ground
50' MDP to "ML" 2x350 KCMIL – 3 Phase 4W + Ground
50' MDP to "PB" 1x1/0 & 2x1/0^n – 3 Phase 4W + 200%n, Ground
50' MDP to UPS 2x350 KCMIL – 3 Phase 4W + Ground
50' MDP to "EL" 2x3/0 – 3 Phase 4W + Ground
100' MDP to TAP 3x500 KCMIL – 3 Phase 4W + Ground
50' TAP to UPS 3x500 KCMIL – 3 Phase 4W + Ground
50' TAP to 400A SW 3x500 KCMIL – 3 Phase 4W + Ground
50' 400a SW to UPS 3x500 KCMIL – 3 Phase 4W + Ground
50' UPS to "CR" 2x250 KCMIL – 3 Phase 4W + Ground
50' "CR" to "UPA" 3x250 KCMIL – 3 Phase 4W + Ground
100' "CR" to "UPC" 3x250 KCMIL – 3 Phase 4W + Ground
50' UPS to "ML" 3x500 KCMIL – 3 Phase 4W + Ground
100' MDP to A/C W 3x500 KCMIL – 3 Phase 3W + Ground
100' MDP to A/C C 3x500 KCMIL – 3 Phase 3W + Ground
100' MDP to A/C E 3x500 KCMIL – 3 Phase 3W + Ground



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com

Mechanical Scope:

Remove (3) existing Trane 50 Ton AC and (1) 7.5 Ton Package Unit Damaged by thieves and replace the following with new Trane Units:
- 3 Each: YCD60CELI*2A4NE8A0**GH RTU 50 TON TRANE
- 1 Each: YSJ090A3SOL**G0000001 RTU 7.5 TON TRANE
- Water heater destroyed during break-in.

Change out controls as needed to operate New Systems.

General Construction:
- Acoustical Ceilings are damaged by all the ducting throughout the mezzanine and ground floor due to break-in.
- Drywall damaged under mezzanine and below ducting throughout both levels.
- All locking doors and wood doors throughout the facility now damaged by break-in.
- All locking door jambs are damaged by break-in.
- All locking door hardware damaged by break-in.
- All carpet and tile flooring damaged in affected areas.

Fire Protection Systems:
- Fire Control Panel Damaged by break-in.
- Smoke fire detectors damaged due to ducting failure due to break-in.
- All fire sprinkler distribution to be reinstalled in suspended acoustical ceiling areas affected.

Security System:
100% of existing security systems are now destroyed, all door sensors are removed or broken in place.

DESIGN            •            ENGINEER            •            BUILD



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com



## Alcatex, Inc.
Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com





DESIGN    •    ENGINEER    •    BUILD



**Alcatex, Inc.**
Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com

DESIGN    •    ENGINEER    •    BUILD



**Alcatex, Inc.**

Data Center Design & Build

669 FM 1138
Royse City, TX 75189
972-226-0047
www.alcatex.com

## Pricing Summary:

| Details | Price |
|---|---|
| Stolen/Damaged Item Remediation | $2,477,000.00 |
| | |
| | |
| Total Price for above Scope | $2,477,000.00 |
| *Not including Tax* | |

We appreciate the opportunity to provide this Proposal on your upcoming project.

If you have any questions relating to this Proposal, please feel free to send an email to Carlton Griffis at any time to discuss.





**Carlton Griffis III**

**Sr. Project Manager**

T: (972) 226-0047 x.202  | C: 214-577-4438
E: carltong@alcatex.com | W: www.Alcatex.com

  

DESIGN            •            ENGINEER            •            BUILD

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Megan Bales on behalf of Graig Fancher
Bar No. 24052016
mbales@bwwlaw.com
Envelope ID: 100739376
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 5/13/2025 8:31 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Graigory B.Fancher | | gfancher@bwwlaw.com | 5/12/2025 5:35:08 PM | SENT |
| Austin Caldera | | acaldera@bwwlaw.com | 5/12/2025 5:35:08 PM | SENT |
| Eric JMillner | | emillner@bwwlaw.com | 5/12/2025 5:35:08 PM | SENT |